## THE CITY OF FREDERICK *v.* BROSIUS HOMES CORPORATION

[No. 411, September Term, 1966.]

*Decided June 6, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*E. Newton Steely, Jr.* and *W. Jerome Offutt,* with whom were *Herbert L. Rollins* and *Rollins & Wenner* on the brief, for appellant.

*Charles U. Price* for appellee.

HORNEY, J., delivered the opinion of the Court.

The question presented by this appeal is whether the agreement (and a city resolution incorporated therein by reference) between the City of Frederick (the city) and Brosius Homes Corporation (the developer) for the development of those portions of the subdivisions of Carrollton and Maplewood lying within the corporate limits of the city, obligates the city to reimburse the developer for funds advanced by the developer to the city for the installation of a storm sewer.

The agreed statement of facts, on which the case was heard below, included as exhibits the original agreement between the parties dated July 13, 1956, the city resolution of March 6, 1952 establishing a general policy with respect to the installation of public utilities in streets, areas and subdivisions, the supplemental agreement between the parties dated March 1, 1957, and stipulations to the effect that the sixty-six inch storm sewer was seven hundred and fifty-six feet long and that it had five inlets.

The developer, having obtained the approval of the planning commission to proceed with the development of the subdivisions, entered into an agreement with the city to advance the full cost of constructing the subdivision streets and roads within the city and for the installation of curbs and gutters, water main, sanitary and storm sewers and street lighting.

Among other things, the developer promised to obtain, for the benefit of the city, an easement running from the subdivisions across the grounds of the Lincoln High School located in the city but outside of the subdivisions to Madison Street and to pay for the installation therein of water lines and storm and sanitary sewers to connect with the existing city water lines and storm and sanitary sewers.

The city, on the other hand, agreed to reimburse the de-

veloper for "the cost of installing storm water sewers to connecting point with existing city storm water sewers."

It was also understood and agreed between the parties that the construction of the facilities across the school grounds as well as the facilities constructed within the subdivisions should "be in accord with and governed by" the terms of the agreement and the resolution of March 6, 1952. Those parts of the resolution which are primarily pertinent to the present controversy read—

"3. City responsibility:
* * *
(2) The city will pay from tax revenue * * * the cost of installation of:
A. Street lighting
B. Storm sewers, but no property taps.
C. Grading and paving streets."
"5. Regulations governing development procedure:
A. Water and sewer extensions will be limited to 100 feet per tap or connection. Extensions in excess of 100 feet shall be at the sole expense of the owner desiring service, * * *."

The developer, pursuant to the terms of the agreement, obtained an easement on behalf of the city across the school grounds, but before the installation of the public facilities contemplated by the agreement was begun a dispute arose as to whether the city was obliged to reimburse the developer for the cost of installing the storm sewers. As a result, a supplemental agreement dated March 1, 1957 was executed in which the parties agreed to proceed with the installation of all the facilities and submit the controversy to judicial determination. The storm sewer, which cost $14,104, was paid for by the developer as agreed.

This declaratory judgment proceeding was brought, pursuant to the supplemental agreement, by the developer against the city for a determination as to whether or not the city was obligated to reimburse the developer for the cost of installing the storm sewer. The lower court, on the premise that the laying of the storm sewer across the school grounds was admittedly a

general improvement of the city sewer system that added to its revenue, found that the agreement between the parties was a binding and enforceable contract and entered a judgment in favor of the developer against the city in the sum of $14,104 to be paid in accordance with the terms of the original agreement. We think the finding of the lower court was correct.

On appeal, the city, relying on Part 5A of the resolution (§ 18.36 a of Art. IV of city code)—limiting the connection of water and sewer extensions to one hundred feet—contends that it is not obligated to reimburse the developer for the cost of extending the storm sewer a distance of seven hundred and fifty-six feet across the school grounds. The developer, on the contrary, relying on the promise of the city to reimburse it for the cost of installing an addition to the storm sewer system to connect with existing city storm sewers, in addition to claiming that Part 5A of the resolution does not restrict the effect of the agreement because it has no application to storm sewers, contends that the agreement is in complete accord with Part 3(2)B of the resolution (§ 18.34 of Art. IV of city code) providing that the city will pay the cost of installing storm sewers from tax revenues.

Municipal contracts, particularly those made in furtherance of the proprietary functions of a municipality, are controlled by the same rules of construction as are applicable to the contracts of private corporations and individuals. The courts, therefore, in construing the meaning and effect of a contract, generally take into consideration such things as the applicable statutes, if any, the intention of the contracting parties and the objectives to be accomplished so as to give the contract a reasonable and practical construction. See 10 McQuillin, *Municipal Corporations,* § 29.116, *et seq.;* 3 Yokley, *Municipal Corporations,* § 443; 63 C.J.S. *Municipal Corporations* § 1011.

As we read the plain and unambiguous wording of the agreement in question and the resolution on which it was based in the light of the intention of the contracting parties and the objectives to be accomplished as expressed in the agreement, it is clear to us that Part 5A of the' resolution, concerning the connection of water and sanitary sewer pipes to dwellings and other

buildings has no application to the additions to the main lines of the water and sanitary and storm sewer systems.

Apparently, the city chose to ignore the differences it had created between storm sewers and sanitary sewers and the different purpose each serves. The basic difference is that storm sewers (like the maintenance and lighting of streets and alleys) serve a wholly public purpose while sanitary sewers serve both a public and private purpose. Except for the payment of property taxes, abutting property owners pay no part of the installation costs of storm sewers [1] or a periodic charge for the maintenance thereof other than the tapping costs should the owner elect to connect his dwelling or other buildings with storm sewers, whereas such abutting owners, in addition to paying property taxes, pay a part of the installation costs [2] of new sanitary sewers, water lines and streets curbs and gutters by way of per front foot assessments and charges for water taps and sanitary sewer connections as well as a periodic or annual water rent.

Throughout the resolution there are several instances in which the word "sewer" when used in connection with "water," as is the case with respect to "water and sewer extensions" in Part 5A, obviously means a sanitary sewer and not a storm sewer. In Part 5B, concerning the installation of utilities at a time the city deems desirable and economical, for which the city pays the cost over and above the stipulated charges, the reference was to "water taps and sewer connections." Likewise, in Part 5C, concerning the connection of service lines to a building lot, the cost of which over and above the stipulated charges is also payable by the city, refers to "only one water line service and only one sewer line service." And in Parts 2F

---

1. This has reference to the provisions in Part 3(2)B that the city will pay the cost of installing storm sewers, other than property taps, out of tax revenues obtained by "the collection of a special city-wide front foot tax and/or by [an] ad valorem tax."

2. Part 3(1) provides that the city will pay the balance of the cost of the improvements described in Parts A, B and C (sanitary sewers, water lines and curbs and gutters) through the levy of the same front foot or ad valorem tax referred to in the first footnote.

and 2J, concerning the charges and payment for water taps and sewer connections of larger size than specified in 2D and 2E, the reference is to a three-fourths inch "water tap" and a six inch *sanitary sewer* connection. Even more significant, the term *storm sewers* is referred to in the resolution only once and that was in Part 3(2)A, B, C and D, providing that the city will pay from tax revenues the cost of the installation of "street lighting" and "storm sewers" and the grading and paving of streets and alleys, all of which, as hereinabove stated, serve a wholly public purpose.

While it is clear that the city had authority pursuant to Part 4A and B of the resolution, to require the developer to advance the full cost of installing the improvements (such as sanitary sewers and water lines) and to reimburse the developer for the cost of such improvements (less the amounts assessable to abutting property owners) from water rents and ad valorem taxes on the affected properties as well as to pay the full cost, pursuant to Part 3(2), of installing storm sewers, it is nevertheless apparent that the Mayor and Aldermen of Frederick, in passing the resolution, did not anticipate the future necessity of having to install additions to the existing water and sanitary and storm sewer systems to serve the needs of an expanding city. But that does not mean, as the city seems to contend, that the agreement was *ultra vires*,[3] for it had authority to make the agreement under which it was enabled to expand the utilities it needed without the issuance of bonds and the payment of interest thereon. See *Eastern Shore B. & C. Co. v. Harrison*, 141 Md. 91, 118 Atl. 192 (1922).

*Judgment affirmed; appellant to pay the costs.*

---

3. Ultra vires, not having been specially pleaded as Maryland Rule 342 c 1 (g) requires, a question as to it could not be raised on appeal.