MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
OHIO CASUALTY INSURANCE
COMPANY ET AL.

[No. 387, September Term, 1981.]

*Decided January 7, 1982.*

The cause was argued before MOYLAN, MOORE and COUCH,
JJ.

*William R. Phelan, Jr., Assistant City Solicitor of Baltimore,* with whom were *Benjamin L. Brown, City Solicitor of Baltimore* and *J. Warren Eberhardt, Assistant City Solicitor of Baltimore,* on the brief, for appellant.

*Lee H. Ogburn,* with whom was *Andrew Jay Graham* on the brief, for appellee Athens General Contractors, Inc. *Robert Phillip Thompson* on the brief for appellee G & M Painting Co., Inc. *George J. Bachrach* on the brief for appellee Ohio Casualty Insurance Company, Inc.

MOORE, J., delivered the opinion of the Court.

The principal questions in this appeal from an order that the City of Baltimore pay the remaining sum due on a masonry contract arise from the denial by the Superior Court of Baltimore City (Greenfeld, J.) of the City's motions for summary judgment, directed verdict, new trial and/or judgment *n.o.v.* The questions are:

> 1) Should a contract between a municipal agency and a private company be interpreted more strictly than ordinary private contracts?
>
> 2) Was the City's dispute with the contractor resolved by arbitration binding on the parties?

The appellants also allege error in the trial court's instructions; however, such error is predicated on appellant's substantive arguments. Since we find those arguments unpersuasive, for the reasons stated herein, we shall answer both questions negatively, endorse the court's instructions as proper, and affirm the result below.

# I

The G & M Painting Company was awarded a $34,900 contract by the Department of Education to clean, cut, point, and waterproof the 1916 brick building known as School No. 214 in Baltimore. G & M, after sandblasting the building and starting the cutting and pointing of the mortar joints,

subcontracted the work to Athens General Contractors, Inc., with the approval of the Project Supervisor, William A. Gieseking, who was named in the contract as the Assistant Superintendent's Representative.[1] The contract called for the old mortar between the bricks to be cut out to a depth of 3/4 of an inch and new mortar troweled in, "unless approval of the Department of Education is granted in cases where a depth this great is not feasible in the interest of a first-class job."

During the cutting, the City's inspector, Aaron S. Powell (since resigned), noticed that bricks were sagging in some places, particularly on the northwest side of the building which contained a "knock-out panel," a 540 square foot area of face veneer brick which could be easily removed to provide access to the school's heating system. The solution to this problem was disputed. Mr. Gieseking testified that he told Athens to cut to a depth of 1/2 inch only in the "knock-out" area. Mr. Powell says Mr. Gieseking told Athens to "cut only where necessary." The upshot was that only about half the brick surface was cut to 3/4 of an inch, about 35 percent was cut to 1/4 of an inch, and the rest was not cut at all. After the work was completed in July 1975, and partial payment of $22,500 was authorized by Mr. Gieseking, some of the "skim pointing" peeled off, resulting in an unsightly facade.

Mr. Gieseking sent two letters to the contractors in September 1975, requesting that half the brick work be recut and repointed but he received no reply. Through the "bad weather" months no further action was taken. On April 22, 1976, the Assistant Superintendent, Curtis E. Lantz, wrote a "Notice of Intent" letter to the contractors, giving them three days to resume cutting and pointing the bricks or be found in default under the terms of the contract. The following March, the Ohio Casualty Insurance Co., Inc., the surety under the original contract, filed a declaratory judgment action against the City of Baltimore. In April 1977,

---

1. The Assistant Superintendent, Curtis E. Lantz, was not named in the contract, a fact noted by both the trial judge and the appellate panel. Thus, authority was placed in a position rather than a person.

Athens and G & M filed cross-claims. On March 13, 1979, the City filed a separate action on the contract against all three parties. The consolidated cases were tried before a jury. A premature appeal from the verdict against the City was dismissed *sua sponte* by this Court on October 21, 1980. Subsequently, a Final Order resolved all claims and this appeal followed.

## II

Appellant's first contention that public contracts require stricter judicial construction than private contracts rests on no cited cases; and we have found none. Indeed, only last year the Court of Appeals stated:

> "The rules which govern the construction of contracts between individuals and private corporations also govern the construction of contracts between individuals and municipalities."

*Anne Arundel County v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228 (1980). *See also City of Frederick v. Brosius Homes Corp.,* 247 Md. 88, 92, 230 A.2d 306 (1967).

Appellant's reliance on *Gontrum v. Mayor of Baltimore,* 182 Md. 370, 35 A.2d 128 (1943) and its progeny, *Inter-City Land Co. v. Baltimore County,* 218 Md. 80, 145 A.2d 263 (1958), and *Kent County v. Abel,* 246 Md. 395, 228 A.2d 247 (1967), is an example of trying to make bricks without straw.[2] The *Gontrum* case reiterated the hoary principle that a municipal corporation cannot be held liable for the unauthorized acts of its agents, absent some ratification or adoption. 182 Md. at 376. As the trial court in the instant case pointed out, the cases supporting that proposition involve a statute or ordinance that specifically vests power in a named public official. Judge Greenfeld stated:

> "I do not perceive this contract to fall in that category. The authority vested in the assistant

---

2. Exodus, 5:7 "Ye shall no more give the people straw to make brick."

superintendent is not one vested by law. In other words, the law does not say that only the assistant superintendent can make modifications or changes in the contract. The assistant superintendent gets his authority from the governing body of the city under that governing body's general powers.

"On that basis . . . this contract come[s] under the normal rules applicable to contracts generally. . . .

"Secondly, I would note that the assistant superintendent, himself, testified that he actually has no contact with the implementation of this contract. He never undertook, during the administration of the project, to do any of the acts that were given to him in the written contract itself. He delegated those acts to people under him, to his subordinates; so even by the assistant superintendent's own procedures, people other than himself were given the power that the contract gives to him, alone.

"In addition to that, the City was quite willing to permit Mr. Gieseking to approve the assignment of the contract from G & M to Athens. The assistant superintendent was never even consulted about that and never expected to be consulted about that.

"The sum and substance of all this is that the assistant superintendent never undertook to do the things that the contract says only he was entitled to do, by his own act."

Appellant's argument that the City of Baltimore's Charter somehow casts in concrete the terms of this contract collapses in a careful reading of Article VI, § 4 (b) and (g) (1964). These provisions cited by appellant cover the powers of the Board of Estimates in the bidding process and the bonding duty of the successful "lowest, responsible bidder." [3]

---

[3] A letter in the record questioned the advisability of awarding a pointing contract to a painting company. "[T]his is akin to giving a plumbing job to an electrician and letting him sub it out to a bricklayer."

There is nary a word about implementing or interpreting the contract itself. The provisions are also silent on the subject of changes in the contract. Appellant's strained interpretation of the City's Charter is no foundation for its novel legal theory that municipal contracts are immovable monuments.

Finally, oral modification of a contract, despite a provision requiring all modifications to be in writing, is permitted in Maryland. *University National Bank v. Wolfe,* 279 Md. 512, 522, 369 A.2d 570 (1977). *Hoffman v. Glock,* 20 Md. App. 284, 288, 315 A.2d 551 (1974). We see no reason to make any exception for municipal contracts. While the contract in this case did require that all changes be effected in writing, modification of the cutting depth was necessary to forestall a "walls come a-tumblin' down" result. At no time during trial did appellant contend that no change was ordered. The factual dispute concerned the extent of the modification, and that was for the jury to resolve. We see no reason to disturb their decision.

### III

The second question is whether the contractors are bound by the "decision" of the assistant superintendent as "arbitrator" that they were in default. A provision in the contract [4] states that the Assistant Superintendent shall

---

The letter also mentions the problem of having to give the job to the low bidder. The difference between the $34,900 bid of G & M Painting Company and the next lowest bid was nearly $10,000. Athens, which took over the job, originally bid $46,500.

4. The "arbitration" portion of the contract reads as follows:

"Supervision and Prerogative of the Assistant Superintendent

(a) The work is to be carried out under the supervision of the Assistant Superintendent and to his entire satisfaction. . . .

(b) To prevent disputes and litigations, the Assistant Superintendent shall in all cases determine the amount or quantity, quality, and acceptability of the work and materials which are to be paid for under the contract; *shall decide all questions and disputes in relation to said work and the performance thereof,* and shall, in all cases, decide every question which may arise relative to the fulfillment of the contract or to the obligations of the

decide all questions and disputes and his determination shall be final and conclusive. While this contract language is similar to that interpreted in *Nelley v. Mayor of Baltimore,* 224 Md. 1, 166 A.2d 234 (1960), *but see Joseph F. Trionfo & Sons v. Ernest B. LaRosa & Sons,* 38 Md. App. 598, 381 A.2d 727, *cert. denied,* 282 Md. 734 (1978), the record in this case discloses no attempt to comply with Md. Cts. & Jud. Proc. Code Ann. §§ 3-213 and 214 a. (1957, 1980 Repl. Vol.). No notice of an arbitration hearing was sent, no adversarial hearing was held, no evidence was received, and no arbitral decision was made. *See Seldner Corp. v. W. R. Grace & Co.,* 22 F.Supp. 388 (D.Md. 1938).

The City attempts some "skim pointing" of its own by arguing that a letter to the contractors on April 22, 1976, was notice of an arbitration decision and that several meetings between its representatives and the contractors were in fact a proper arbitration hearing. As appellee notes,

---

Contractor thereunder. *His determination, decision and estimate shall be final and conclusive* upon the Contractor and in case any question shall arise between the Contractor and the City touching the contract, such determination, decision and estimate shall be a condition precedent to the right of the contractor to receive any monies under the contract." (Emphasis added.)

The language of this clause contrasts with the wording of the American Institute for Architects' standard clause as quoted in *Frederick Contractors, Inc. v. Bel Pre Medical Center, Inc.,* 274 Md. 307, 334 A.2d 526 (1975), *reversing Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc.,* 21 Md. App. 307, 320 A.2d 558 (1974) on other grounds:

"7.10.1 All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof, except as set forth in Subparagraph 2.2.9 with respect to the Architect's decisions on matters relating to artistic effect, and except for claims which have been waived by the making or acceptance of final payment as provided by Subparagraphs 9.7.5 and 9.7.6, *shall be decided by arbitration* in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. *This agreement so to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final,* and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." (Emphasis added.) 274 Md. at 310-11.

While the language in the City's contract may be interpreted as an arbitration clause, as appellant contends and appellee concedes, it would seem advisable to spell out such arbitration provisions in municipal contracts, in language similar to the A.I.A. clause above quoted.

the letter follows the wording of the contract provision entitled, "Annulment of Contract," under which the Assistant Superintendent may, upon three days' notice, declare the contract in default and hire another contractor to take over and finish the job. In *Nelley, supra,* upon which appellant relies, the meeting sought by the contractor to press his claims for additional compensation was "evidently in the nature of a hearing." 224 Md. at 5-6. Two days later, the contractor was informed of the arbitrator's decision "[a]cting in pursuance * * * [of his] power and authority as referee under the contract, . . ." *Id.* at 6. There is no such language or understanding in the instant case.

Appellant's reliance on *Mayor of Baltimore v. Allied Contractors, Inc.,* 236 Md. 534, 204 A.2d 546 (1964), and *J. A. La Porte Corp. v. Mayor of Baltimore,* 13 F.Supp. 795 (D.M. 1936), is misplaced, as shown by the factual settings of those cases. In the former, both sides had agreed to arbitration under the contract which stated that the Director of Public Works of Baltimore "will be the referee," 236 Md. at 538, and a series of meetings had taken place," culminating with two full days of investigation . . . during which each claim was checked in detail." *Id.* at 539. The issue was not whether arbitration had occurred, as in this case, but rather, whether the arbitrator's decision was binding on the City. Considering all the circumstances, the Court said, "the conduct of the parties questionably indicates that the meeting . . . was intended to be a final arbitration of the damages claimed." *Id.* at 545.

In *La Porte, supra,*[5] the contract provision analogous to the one in this case contains an additional phrase that, in

---

5. The Court was sharply critical of the contract at issue:

"[W]e feel it is essential to make it clear that contracts of the character of the one in suit are open to very severe criticism, as are also both parties to them, because, by reason of the inexcusably obtuse manner in which such contracts have been drawn and adopted, they at once invite litigation of the most involved and protracted character, thus casting upon the courts unnecessary and very onerous work which they should not be called upon to perform. In other words, if parties to a contract see fit to adopt provisions which their own experts are unable to interpret intelli-

effect, allows the Chief Engineer to construe the terms and conditions of the contract. 13 F.Supp. at 797. Appellants correctly analyze that case to conclude that such provisions "have the effect of the award of an arbitrator, and . . . "are conclusive and binding upon the parties." *Id.* at 798. However, the case is inapplicable to the present controversy, simply because in *La Porte* there was an arbitration (although the arbiters could not agree) and here there is none. The instant contract specified cutting to 3/4 of an inch, "unless . . . a depth this great is not feasible. . . ." The contract specification was orally modified by the Assistant Superintendent's Representative, Mr. Gieseking. The extent of the modification was disputed and the dispute was resolved by the jury. In the entire record, there is no hint of any arbitration. Thus, the Assistant Superintendent's letter warning of default could not also serve as an arbitration award.

## IV

Four of the appellant's prayers for instructions were denied by the trial court and appellant excepted to one of the instructions given. All the exceptions were based on the contentions advanced by appellant in support of the first argument in its brief. We have rejected these contentions. Thus, the trial judge properly refused to instruct the jury that:

> 1) The contractors could rely *only* on the Assistant Superintendent's authority. This prayer was improper because the contract named Mr. Gieseking as the Assistant Superintendent's Representative.

---

gently, or to explain satisfactorily, why they were included, as is true in the present case, they can scarcely be heard to complain if a court of law finds it difficult or impossible to ascertain just what force and effect was intended to be given to such provisions, if, indeed, any intent at all lay behind their inclusion."

2) The City was not bound by Mr. Gieseking's actions. This prayer was improper because the jury had sufficient evidence from which it could find that Mr. Gieseking had authority for his actions.

3) The default decision of the Assistant Superintendent was final and conclusive. This prayer was improper because *Nelley, supra,* the case relied on for such an instruction, concerned an actual arbitration — none occurred in this case.

4) The City was not estopped from enforcing its right to complete performance under the contract. This prayer was also improper. The contract gave the City a right to show incomplete performance and demand damages notwithstanding any payments or representations made to the contractor. No one contested the City's right to bring its action. The requested instruction was plainly unnecessary.

Further, the City's exception to the instruction on oral modification of a contract is ill-founded because the trial judge correctly stated the law.

To be entitled to have its theory of the case presented to the jury, appellant must support that theory with a proper exposition of the law and sufficiently developed evidence. *Levine v. Rendler,* 272 Md. 1, 13, 320 A.2d 258 (1974). Here, we are asked to construct a special rule for interpreting municipal contracts, but there is no precedential or statutory foundation to support such a request. We are also asked to transform a letter of default into an arbitration award, but there is no evidence of notice of a hearing or of any arbitration proceeding. We therefore affirm the judgment of the court below.

*Judgment affirmed; costs to be paid by appellant.*