671 A.2d 80

**BALTIMORE TEACHERS UNION, AMERICAN FEDERATION OF TEACHERS, LOCAL 340, AFL–CIO**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**No. 710, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Feb. 7, 1996.

Joel A. Smith (Christyne L. Neff and Kahn, Smith & Collins, P.A., on the brief), Baltimore, for appellant.

James S. Ruckle, Jr. (Otho M. Thompson, Deputy City Solicitor, on the brief), Baltimore, for appellee.

Argued before BLOOM, CATHELL and DAVIS, JJ.

DAVIS, Judge.

This appeal arises out of a dispute between the Baltimore Teachers Union, American Federation of Teachers, Local 340, AFL–CIO (appellant) and the Mayor and City Council of Baltimore (appellee) over appellee's alleged breach of a wage agreement between the parties. Although a number of questions are presented for our review, we restate them, distilled to two substantive issues, as follows:

I.    Was it a "mistake so gross as to work manifest injustice" for the arbitrator to determine that he was without authority to award a remedy for the breach of contract?

II.   Was it a "mistake so gross as to work manifest injustice" for the arbitrator to determine that a valid contract existed under which appellee could be liable?

We answer both questions in the affirmative. As we shall explain, the result of our disposition of these questions is that the judgment of the Circuit Court for Baltimore City (Ward, J.) must be affirmed.

## FACTS

The sad affair that gives rise to this appeal presents yet another setback for the most noble of professions whose members perform the most essential function in a well-ordered society. Appellants won a Pyhrric victory in their quest for parity in pay with the jurisdictions surrounding Baltimore City—that victory coming in the form of an agreement with appellees to grant the pay increases—only to then face the dual obstacles of procedural barriers and budget shortfalls.

On June 24, 1992, appellant filed suit against appellee in the Circuit Court for Baltimore City to compel appellee to submit to arbitration a contract grievance between the parties, the details of which are fully discussed below. On June 25, 1993, the circuit court ordered that the parties submit their dispute to arbitration. The circuit court amended this order on August 3, 1993, directing "that the Parties proceed to arbitration on all issues, both procedural and substantive." Collec-

tively, these orders shall be referred to as the circuit court's Orders to Arbitrate.

As ordered, the matter proceeded to arbitration. Over the course of several days in April and May of 1994, full hearings were held before an arbitrator from the Federal Mediation and Conciliation Service. Evidence was presented, testimony was taken, and arguments were submitted. On December 7, 1994, the arbitrator issued a lengthy written Opinion and Award. The Opinion and Award comprehensively recites the underlying facts of this dispute. As the parties do not dispute these facts, our discussion below summarizes the facts as set forth in the Opinion and Award.

Appellant represents appellee's teachers in collective bargaining negotiations with appellee. Salaries of Baltimore City teachers have historically been lower than the salaries of teachers in surrounding jurisdictions. This gap between salaries has reached $5,000 per year in recent years, and has caused difficulty in attracting quality teachers to Baltimore City and an ongoing loss of experienced teachers to higher paying surrounding jurisdictions. This disparity has been a concern of elected officials, including Mayor Schmoke, administrators, teachers, and appellant.

According to the testimony of witnesses for appellant, to address the wage disparity problem, appellant desired an 8% wage increase in the first two years of a three-year collective bargaining agreement and, in the third year, wage parity with surrounding jurisdictions. Appellant states that, in response, Mayor Schmoke stated something to the effect of "you've got it." According to appellant's witnesses, the Mayor was aware of anticipated APEX funding [1] from the State, and the parties contemplated that parity would be achieved out of those funds.

---

1. According to appellant, "APEX (the 'State and Federal Aid to Education' statute) is codified at [MD.CODE ANN., EDUC. § 5–201]. Each year the City receives hundreds of millions of dollars in APEX monies according to the requirements set forth in the Education article. Sec[tion] 5–401(a)(2)(i) authorizes local government expenditure of

In 1988, appellee and appellant entered into negotiations over a collective bargaining agreement (Agreement). During these negotiations, then-Labor Commissioner Richard J. Whalen represented appellee. Whalen opposed the concept of automatic parity and refused to agree to the parity package. Appellant went to the Mayor, who supported appellant's position, and worked with appellant to craft a comparability formula.[2] According to appellant's witnesses, appellee thereupon changed its position at the bargaining table and accepted appellant's parity concept.

The agreement that was eventually negotiated covered the period July 1, 1989 through June 30, 1992 (fiscal years 1990, 1991 and 1992).[3] The agreement provided wage increases of 8% in each of the first two fiscal years. The following "wage reopener" provision (Section 5.1.3. of Article V, Compensation and Related Matters, of the Agreement) controlled in the third year of the Agreement (fiscal year 1992):

> The Employer and the Union agree to reopen negotiations on salaries for the 1991–92 school year. It is the goal of the City of Baltimore and the [Union] to support salary levels for teachers comparable to competitive area districts. Adjustments to the salary schedule for the third year shall be determined by the following methods:
>
> a. A list of districts shall be identified and 1991–92 salary schedules obtained from those districts.

---

'compensatory education funds' (discretionary APEX money) in any of seven expense categories, one of them being teacher salaries."

2. The comparability formula was a formula by which the wages of appellee's teachers and teachers in other jurisdictions could be effectively and accurately compared.

3. The Opinion and Award initially states that the Agreement covered years 1988 through 1991. This, however, appears to be a mistake. The record reflects that the correct date of the Agreement is 1989–1992. The parties refer in their briefs to the 1989–1992 Agreement, and the date of the Agreement in the Record Extract is 1989–1992. In addition, farther into the Opinion and Award, the arbitrator refers to the 1989–1992 Agreement.

b. Benchmark positions are the minimum and maximum positions on each lane of the schedule.

c. The benchmark positions shall be averaged for all districts in the sample.

d. The City will cooperate with [Union] requests for revenue or expenditure estimates.

e. Once implemented, the schedule shall remain in effect until modified through subsequent agreements.

By the fall of 1990, when negotiations began between appellee and appellant under the wage reopener provision, the economy was stagnant, and appellee and the State were experiencing serious financial problems. The Opinion and Award refers to *Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1020 (4th Cir.1993), wherein appellee's poor financial condition and its operational and budgetary actions in response thereto are fully described.

In early February 1991, in advance of fiscal year 1992, the parties attempted to negotiate a successor agreement to the 1989–1992 Agreement. Appellant sought both general and parity wage increases, asserting that such increases were due under the wage parity reopener provision of the Agreement and that revenues were available to fund the increases. Furthermore, appellant asserted that a wage gap between appellee's teachers and surrounding jurisdictions remained. Appellant's calculations for fiscal year 1992 indicated a 12.9% wage gap. Appellant insisted that the agreed-upon parity "goal" meant a definite commitment to "do something" about achieving parity, assuming revenues could be identified.

Appellee's position, on the other hand, was that there were no funds available for wage increases for fiscal year 1992. Moreover, based on arguments concerning national wage levels for teachers in large cities, appellee asserted that parity increases were not due. Appellee further argued that the Agreement's use of the word "goal" was insufficient to constitute a binding promise. The parties ultimately agreed to a wage freeze for fiscal year 1992.

The wage agreement for the fiscal year 1992 wage reopener was embodied in a September 12, 1991 letter from Jesse E. Hoskins, appellee's acting Labor Commissioner, to Irene Dandridge, appellant's President. The parties refer to this letter as the first "Side Letter." Dandridge counter-signed and dated the first Side Letter in an underlined space corresponding to the typed-word "ACCEPTED." Paragraph 3 of the first Side Letter reads, in pertinent part, as follows:

[Appellee] and [appellant] agree to restate our position on Article V—Compensation and Related Matters, Paragraph 5.1(3). The parties agree that the *goal* of [appellee] and [appellant] is to support salary levels for teachers comparable to our competitive area districts. To further our mutual commitment, effective July 1, 1992, a minimum annual parity increase of not less than one percent (1%) will be received. Such parity increases in the aggregate shall not exceed six percent (6%). During FY 1993 and subsequent years both parties agree that the parity increase will only be received *provided revenues can be identified.*

(Emphasis added).

During fiscal year 1992, the State cut funding to appellee twice, totalling approximately $37.5 million. These cuts, along with a decline in tax revenues, forced appellee to terminate or cut programs, and furlough and lay off employees. During the course of fiscal year 1992, appellee also imposed several unpaid furlough days ("K days") on teachers.

The Agreement and first Side Letter were set to expire at the end of fiscal year 1992. For fiscal year 1993, the parties signed a second Side Letter, dated June 19, 1992, in which the parties confirmed their agreement to extend for one year the Agreement and the terms of the first Side Letter. The Opinion and Award states that appellant had the second Side Letter approved by appellee's Board of Estimates, committing appellee to honor its terms for fiscal year 1993. The second Side Letter was stamped "APPROVED BY THE BOARD OF ESTIMATES JUL 29 1992," and signed by appellee's comptroller. According to the arbitrator, Board of Estimates

approval of the second Side Letter was consistent with its treatment of contracts with vendors and others, but not consistent with its general practice in reviewing collective bargaining agreements.

During negotiations for fiscal year 1993 (and also for previous fiscal year 1992), Hoskins reviewed the proposed "provided revenues can be identified" language of the first Side Letter with Edward Gallagher, appellee's Director of Finance. Gallagher assumed that Hoskins wrote that language, and indicated to Hoskins that Gallagher could "live with it." Gallagher testified that he understood the language to "obligat[e] the [appellee] to try, if it could identify revenues, to provide th[e] parity adjustment," and asserted that the identification of revenues was the right of appellee, rather than a joint task of appellee and appellant. Gallagher testified that "identifying revenues" was a budget term of art for finding revenues from new or unanticipated sources, over and above the current budget allocation. Gallagher conceded that appellee's administration was obligated to make a good-faith effort to identify revenues to fund the parity increase.

Notwithstanding this understanding, Gallagher stated that neither he nor his department carried out this obligation. Gallagher confirmed that the Board was ultimately responsible for identifying revenues, based on, though not necessarily adopting, appellee's recommendations. Gallagher conceded that neither the wage increase nor the obligation to identify revenues was included in his transmittals submitted to the Board of Estimates. Nor did Gallagher do anything else to alert the Board of Estimates of appellee's obligation to identify revenues. Gallagher conceded that it was appellee's duty to do this, and that the Board of Estimates might not have been aware of the obligation to identify revenues. In sum, Gallagher dismissed the process of identifying revenues as being much less important than his overall efforts to balance the budget that year.

Appellee spent its fiscal year 1993 APEX monies on fixed assets, additional administrators, a new management informa-

tion system, and other items, none of which included salary increases for teachers, despite the fact that $16 million of the $38 million of APEX money that the State directed to appellee for education was considered "unrestricted."[4] The Department of Finance did not allocate revenues in its proposals for the fiscal year 1993 budget for a parity increase. When the budget proposals reached the Board of Estimates, neither the Department of Finance nor the Board raised the issue of wage parity. The budget recommendations adopted by the Board of Estimates for fiscal year 1993 included no such monies.

By letter dated June 15, 1992, appellant reiterated its position that revenues were available in the budget for a parity increase for fiscal year 1993. Appellant requested arbitration as to the meaning of the term "revenues" and the nature of the parties' obligations under the Side Letter for fiscal year 1993.[5] Appellee refused to arbitrate, whereupon appellant obtained the circuit court's Order to Arbitrate the fiscal year 1993 dispute.

After presenting these facts, the arbitrator made certain determinations. Central was the determination that the Side Letters constituted a binding contract for fiscal year 1993. Under this contract, the fiscal year 1993 wage increase to achieve parity was conditioned on the identification of revenues. The arbitrator further determined that appellee had an obligation to review its revenues and priorities diligently and in good faith in an attempt to identify sufficient revenues from which wage parity could be funded. According to the arbitra-

---

**4.** Appellant points out that a one-percent pay increase would have cost appellee $2.5 million. The arbitrator recognized this when he wrote in his Opinion and Award that in a budget of $460 million for the Department of Education, "184 $2.5 million 'chunks' " may have been found to cover the pay increase.

**5.** In the event of contract disagreements between the parties, dispute resolution procedures are provided for in Article IV of the Agreement. These procedures culminate in final and binding arbitration. Apparently, it was under these provisions that appellant demanded arbitration of the matter.

tor, however, appellee failed to do this, thereby breaching its contract under the Side Letters for fiscal year 1993.

Although finding that appellee breached the fiscal year 1993 wage increase agreement, the arbitrator determined that he was without authority to grant a remedy for the breach. In this regard, the Opinion and Award reads, in pertinent part, as follows:

Wages paid to teachers, including any parity increase for [fiscal year] 1993 which might have been paid pursuant to the Side Letters, come from appropriated funds. To be paid, the funds must be approved in accordance with the budget process. I have searched the language of the Agreement; and I am not persuaded that it gives me authority to direct the budget process and, in particular, no authority to direct the policy or legislative processes. I have searched [appellant's] arguments and case law for authorities which would support my authority to direct such a result. I find none.

Indeed, the facts that the political and budget process have been completed for [fiscal year] 1993, the revenues (including the APEX funds) spent, and the books closed would appear to require that any monetary award be paid from funds from the current or subsequent fiscal year. And those payments would also require authorization from the appropriate legislative bodies. Thus, it does not appear that there is *any* effective way for any forum other than the Board of Estimates to remedy [appellee's] breach of its obligation.

To require [appellee], at this time, to conduct a review to determine whether [fiscal year] 1993 APEX monies were required to have been spent on the parity increase, or whether other revenues might have been identified, would be an exercise in futility. The actual spending figures for that year superseded the budget figures prepared in advance. To require [appellee], retroactively, to pay the parity increase assumes the very determination as to revenue identification and priorities which the Side Letters did not require.

Of [appellant's] argument that State law (the Maryland Educational Code) binds [appellee] to accept both arbitral determination and remedy, notwithstanding limitations the Charter might impose, I am not convinced. Neither the Agreement nor the general provision of the Code give me authority to order the appropriation of taxpayer funds. That is the exclusive prerogative of the legislature. Further, the most that I can enforce is the agreement of the Parties themselves. As the discussion in the foregoing sections indicates, I am not persuaded that the Side Letters required [appellee] to pay a parity increase.

It may well be that other forums, judicial or political, have authority to compel [appellee] and Board to take concrete steps toward the goal of pay equity, based on the [fiscal year] 1993 obligation of [appellee], as expressed in the Side Letters. I express no opinion as to the existence of such authority by any other forum. If so, my conclusion and Award that [appellee] violated its obligation under those Letters may be a useful finding. However, I am not persuaded that I have authority to more than make such a declaration. The Award so reflects.

(Citation omitted).

After the issuance of the arbitrator's Opinion and Award, appellant filed a motion with the circuit court to modify or vacate the arbitrator's decision. Therein, appellant requested, among other things, that the circuit court order the "payment of the parity wages due in Fiscal Year 1993 to the City's teachers" in order to correct the arbitrator's "palpable mistake of law" in refusing to fashion a remedy. Both parties filed motions for summary judgment. In support of its motion, appellee argued that the arbitrator's Opinion and Award should not be modified or vacated because: (1) the arbitrator did not commit a "palpable error of law" in determining that he was without authority to order or appropriate the expenditure of taxpayer money, and (2) since there was not a genuine dispute of material fact that the Board of Estimates did not appropriate the money for the wage increase, there was not a final approval of the wage increase agreement for fiscal year

1993, and thus, a valid and binding contract did not exist between the parties under which appellee could be liable.

On April 10, 1995, the circuit court granted appellee's motion for summary judgment and denied appellant's motion for summary judgment. In so doing, the circuit court "adopt[ed] the reasoning of [appellee]," without any further explanation. This appeal follows.

## LEGAL ANALYSIS

### Standard of Review

The principles controlling the standard of appellate review of an arbitrator's award are crucial in the case at hand. Because neither the Agreement nor Side Letters expressly provided that the Maryland Uniform Arbitration Act (MUAA) should apply, the MUAA does not apply here. MD.CODE ANN., CTS. & JUD.PROC. § 3–206(b) (1995); *Board of Educ. v. Prince George's County Educators' Ass'n.*, 309 Md. 85, 96, 522 A.2d 931 (1987). "Rather, the Maryland common law principles for reviewing arbitration awards are controlling." *Prince George's County Educators' Ass'n.*, 309 Md. at 98, 522 A.2d 931. In *Prince George's County Educators' Ass'n.*, the Court of Appeals held:

> Under Maryland common law standards for reviewing arbitration awards . . . we hold that an award is subject to being vacated for a "palpable mistake of law or fact . . . apparent on the face of the award" or for a "mistake so gross as to work manifest injustice."

*Id.* at 105, 522 A.2d 931. Additionally, *Prince George's County Educators' Ass'n.* recognized that courts have vacated arbitration awards based on the similar standard of "manifest disregard of law." *Id.* at 101–05, 522 A.2d 931. According to the Court of Appeals, courts consider a " 'manifest disregard of law . . . [to] be something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' " *Id.* at 102, 522 A.2d 931 (quoting *San Martine Compania De Navegacion, SA v. Saguenay Terminals, Ltd.*, 293 F.2d 796, 801 (9th Cir.1961)).

*See also Jih v. Long & Foster Real Estate, Inc.,* 800 F.Supp. 312, 317, 320 (D.Md.1992) ("manifest disregard of the law" is a common law basis for judicial review of arbitration awards connoting more than a mere legal error or misunderstanding).

Similarly, in *Chillum–Adelphi Volunteer Fire Dep't v. Button & Goode, Inc.,* 242 Md. 509, 517, 219 A.2d 801 (1966) (citations omitted), the Court of Appeals stated:

> Although a court may modify an arbitration award for a mistake of form such as an evident miscalculation of figures, an arbitrator's honest decision will not be vacated or modified for a mistake going to the merits of the controversy and resulting in an erroneous arbitration award, unless the mistake is so gross as to evidence misconduct or fraud on his part.

Indeed, because Maryland courts have historically considered arbitration to be a "favored" dispute resolution method, common law rule dictates that courts generally must defer to the arbitrator's findings of fact and applications of law. *Baltimore County v. City of Baltimore,* 329 Md. 692, 701, 621 A.2d 864 (1993). Thus, courts are fairly reluctant to disturb the award of an arbitrator where the award reflects the honest decision of the arbitrator and is the product of a full and fair hearing of the parties. *Id.* (citing *Prince George's County Educators' Ass'n,* 309 Md. at 98, 522 A.2d 931). *See also Mayor & City Council of Baltimore v. Allied Contractors, Inc.,* 236 Md. 534, 545, 204 A.2d 546 (1964) ("an award is final and conclusive on both parties in the absence of fraud or mistake so gross as to imply bad faith or the failure to exercise honest judgment.").

Distinguishing between a "palpable mistake of law or fact ... apparent on the face of the award" or a "mistake so gross as to work manifest injustice," or a "manifest disregard" is like shoveling smoke. *Williams v. Superintendent,* 43 Md.App. 588, 591, 406 A.2d 1302 (1979), *vacated,* 288 Md. 523, 419 A.2d 383 (1980). Indeed, these standards are so closely related to each other that they appear to be no more than different ways of describing the same thing. However the

mistake is characterized, the burden of showing that an award is invalid rests with the party attacking the award. *Parr Constr. Co. v. Pomer*, 217 Md. 539, 543, 144 A.2d 69 (1958). In view of the foregoing, this burden is a heavy one.

In addition to these principles, we must be mindful that the circuit court granted appellee's motion for summary judgment and denied appellant's motion for summary judgment, thereby denying appellee's petition to modify or vacate the arbitrator's award. Where no issue of fact exists to be tried before the circuit court, as in this case, summary judgment may properly be granted in a judicial proceeding challenging an arbitration award. *Chillum–Adelphi Volunteer Fire Dep't*, 242 Md. at 519, 219 A.2d 801. Thus, in reviewing a trial court's grant of summary judgment, an appellate court is required to determine whether the trial court's ruling was legally correct. *Nationwide Mut. Ins. Co. v. Scherr*, 101 Md.App. 690, 694, 647 A.2d 1297 (1994); *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md.App. 772, 785, 614 A.2d 1021 (1992), *cert. denied*, 330 Md. 319, 624 A.2d 490 (1993). If, therefore, the arbitrator's award should, as a matter of law, remain undisturbed, then the trial court was legally correct in entering summary judgment against appellant and in favor of appellee. *Chillum–Adelphi Volunteer Fire Dep't*, 242 Md. at 519, 219 A.2d 801.

Before turning to the merits of this appeal, while keeping in mind the above principles, it is necessary to bring into focus our specific task on this review, in light of the nature of the circuit court's order granting summary judgment in favor of appellee and against appellant. As we stated above, the trial judge adopted appellee's reasoning in ruling as it did. Also as mentioned above, appellee's reasoning was that it was entitled to summary judgment on two grounds: (1) the arbitrator did not commit a "palpable error of law" in determining that he was without authority to grant a remedy; and (2) since it was undisputed that the Board of Estimates did not appropriate funds for the wage increase, the Board of Estimates did not

finally approve the wage increase agreement, and, therefore, a binding, valid agreement did not exist.

Because the circuit court did not state on which of these two grounds its grant of summary judgment was based, we must operate on the basis that the circuit court's ruling was alternative in nature. In other words, under the circuit court's ruling, appellee was entitled to judgment as a matter of law because the arbitrator's determination that he was without authority to grant a remedy (assuming a valid contract existed) was not so erroneous under the above standard of review principles as to require that determination to be set aside or modified, or, in the alternative, because there was no contract between the parties. This means that on this review we must determine whether the circuit court was legally correct in basing its grant of summary judgment in favor of appellee and against appellant on either of the two alternative grounds.

## I

Our first task, under the above enunciated principles of judicial review, is to determine whether the circuit court was legally correct in leaving undisturbed the arbitrator's conclusion that he was without authority to grant a remedy. Essentially, appellant argues that the arbitrator's refusal to grant a remedy was a palpable error of law apparent on its face, which will work a manifest injustice. In this regard, appellant contends that the arbitrator "ducked" his responsibilities under the circuit court's Orders to Arbitrate, which required arbitration of "all issues, both procedural and substantive." Moreover, appellant asserts that the arbitrator defeated the strong public policy underlying arbitration (namely, that arbitration bring the dispute to a final resolution) by finding a breach of contract but not awarding a remedy therefor. Appellant relies on *Snyder v. Berliner Constr. Co.*, 79 Md.App. 29, 555 A.2d 523 (1989), for this proposition.

We agree with appellant's position. The arbitrator's decision declining to award a remedy was a palpable error resulting in a manifest injustice requiring the vacation or modifica-

tion of the arbitrator's Opinion and Award. As fully explained below, consistent with the principles of appellate review of an arbitration award, we find that the arbitrator's refusal to grant appellant a remedy, after so definitely determining that appellee had breached the fiscal year 1993 wage parity agreement, to be an improper abdication of his jurisdiction.

Our holding rests largely on *Snyder*. While we recognize that *Snyder* may not be controlling on this appeal, because it was decided under the MUAA, the case is highly persuasive and is instructive in the resolution of this issue. In *Snyder*, a building owner refused to pay a contractor the final installment under a renovation contract. *Id.* at 31, 555 A.2d 523. The contract contained an arbitration clause, and the owner submitted the dispute by letter to the American Arbitration Association (AAA). *Id.* at 32, 555 A.2d 523. The letter, among other things, stated that "no money is due from the owner to the contractor." *Id.* The contractor responded with an "Answer and Counterclaim," stating that all work was properly performed under the contract, and that the final installment was therefore due and owing. *Id.* AAA then advised the contractor that the counterclaim was not necessary since the question of liability for the installment had been submitted by the owner's initial letter. *Id.* Accordingly, the contractor withdrew the counterclaim, reserving it as a defense to the owner's claim. *Id.* at 32–33, 555 A.2d 523.

After an evidentiary hearing, the arbitrator issued an order and opinion granting the owner's claim that it was not liable to the contractor for the final installment. *Id.* at 33, 555 A.2d 523. "In the same breath, however, the arbitrator stated that [the contractor's] claim was meritorious, lacking only a request for monetary relief." *Id.* In this regard, the arbitrator concluded that he was without authority to grant monetary relief since the counterclaim requesting such relief had been withdrawn. *Id.* The arbitrator "nevertheless granted [the owner] a monetary award of $1,500.00, 'in full settlement of all claims submitted.'" *Id.*

In response, the contractor requested the circuit court to vacate the arbitrator's award. *Id.* Finding the arbitrator's award to be "clearly irrational," the trial judge vacated the award and remanded the case to AAA for a determination of the owner's liability. *Id.* The owner appealed the trial judge's remand order to this Court, and we affirmed the circuit court. *Id.*

During our discussion of an appellate court's standard of review under the MUAA of an arbitrator's award, we made several important observations. First, we noted that an arbitrator will be deemed to have exceeded his powers where he issues "an award which cannot be supported by any rational construction of the parties' *substantive contractual provisions.*" *Id.* at 37, 555 A.2d 523 (citing *O.S. Corp. v. Samuel A. Kroll, Inc.,* 29 Md.App. 406, 408–09, 348 A.2d 870 (1975)).[6] Second, we observed that "arbitrators exceed their jurisdiction by refusing to consider all claims that are properly before them." *Id.* at 37–38, 555 A.2d 523 (citing *McKinney Drilling Co. v. Mach I Ltd. Partnership,* 32 Md.App. 205, 211, 359 A.2d 100 (1976)).

With these principles in tow, we then set out to determine whether the arbitrator's failure to fashion a remedy warranted correction of the award. In so doing, we explained as follows:

> We begin by reiterating that [the owner's] original letter of submission to AAA requested a finding that "no money is due from the [owner] to the [contractor]." [The owner] plainly was referring to the final $86,767.28 contract installment.... Whether the arbitrator ever resolved this issue is difficult to ascertain due to the sparse record of the arbitration proceedings and the rather obtuse opinion issued by the arbitrator when announcing his award. While the arbitrator ultimately found that [the owner] owed no money to [the contractor], the basis for this decision is at best

---

**6.** We note that the "completely irrational" standard discussed in *O.S. Corp.* has neither been accepted nor rejected by the Court of Appeals. *See Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.,* 313 Md. 652, 659, 547 A.2d 1048 (1988).

murky. He either decided the matter on a substantive basis, concluding that the [contractor's] work on [the owner's] property was deficient, or he decided the case on a procedural basis, concluding that he lacked the jurisdiction to grant an award in response to [the contractor's] perhaps otherwise meritorious position. In either case, we will affirm the ruling of the trial court.

*Id.* at 38, 555 A.2d 523. Accordingly, we held that if the arbitrator's decision was a substantive determination, then it was completely irrational. *Id.* at 39, 555 A.2d 523. In this regard, we stated that it approached the "height of irrationality" for the arbitrator to deny the contractor relief, yet state that the contractor's position was meritorious. *Id.* at 39, 555 A.2d 523.

Alternatively, if the arbitrator concluded that he was without authority to grant a remedy to the contractor for the owner's breach, then this was improper as a matter of law. *Id.* We held that the arbitrator's belief that the contractor's withdrawal of the counterclaim precluded monetary relief was an "unduly restrictive view of his jurisdiction." *Id.* at 39–40, 555 A.2d 523. This was because the arbitrator's power to grant an award emanated not from the contractor's counterclaim, but from the owner's original submission of the dispute to arbitration. *Id.* at 40, 555 A.2d 523. "Indeed, there would have been no need for an arbitration had this central issue of contract liability been removed from consideration." *Id.* at 39, 555 A.2d 523. We therefore affirmed the trial court's ruling remanding the case to the arbitrator for a full and complete determination. *Id.* at 40, 555 A.2d 523.

As mentioned, *Snyder* is not necessarily controlling on this appeal. Most obviously, *Snyder* was a MUAA case, and the instant appeal is under the common law. This, however, does not render *Snyder* uninstructive here. Although we need not decide conclusively, the common law principles discussed above relating to our standard of review appear to be quite similar to those embodied in the MUAA. As we explained in *Snyder*

Section 3–223 of the MUAA provides that the court shall modify or correct an arbitrator's award if:

    (1) There was an evident miscalculation of figures or an evident mistake in the description of any person, thing, or property referred to in the award;

    (2) The arbitrators have awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted; or

    (3) The award is imperfect in a matter of form, not affecting the merits of the controversy.

Section 3–224(b) further provides that an arbitrator's award will be vacated if:

    (1) An award was procured by corruption, fraud, or other undue means;

    (2) There was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party;

    (3) The arbitrators exceeded their powers;

    (4) The arbitrators refused to postpone the hearing upon sufficient cause being shown for the postponement, refused to hear evidence material to the controversy, or otherwise so conducted the hearing . . . as to prejudice substantially the rights of a party; or

    (5) There was no arbitration agreement . . ., the issue was not adversely determined in proceedings under § 3–208, and the party did not participate in the arbitration hearing without raising the objection.

*Id.* at 36, 555 A.2d 523 (quoting Md.Code Ann., Cts. & Jud.Proc. § 3–223(b) & § 3–224(b)).

As *Snyder* explained, under the provisions of the MUAA, an arbitrator will be deemed to have exceeded its powers where the arbitrator issues an award not supported by any rational construction of the parties' substantive contractual provisions, or refuses to consider all properly submitted claims. These principles provided the basis upon which *Snyder* held that the

arbitrator's refusal to grant a remedy, after having found a breach, warranted correction of the arbitrator's award. These principles also appear to be embodied in the common law standard of a "mistake so gross as to work manifest injustice." In other words, an arbitrator's refusal to grant a remedy where empowered to do so would seem to result in a mistake so gross as to work manifest injustice. We are satisfied, therefore, that *Snyder*'s legal principles relating to an arbitrator's failure to provide a remedy, after having found a breach, are, at a minimum, helpful here.[7]

Thus, with *Snyder* as our guide, we are convinced that it was a mistake so gross as to work manifest injustice for the arbitrator to refuse to provide a remedy after determining that appellee breached the fiscal year 1993 wage parity agreement. Despite appellee's suggestion to the contrary, after our review of the arbitrator's Opinion and Award, we have no doubt that the arbitrator determined that a valid wage contract for fiscal year 1993 did in fact exist between the parties.[8] It is equally clear that the arbitrator found that appellee breached the contract by failing to undertake a good-faith effort to identify revenues with which to fund the pay increase. Having determined that appellee breached its obligation to identify revenues—a "precondition," according to the arbitra-

---

**7.** Whether an arbitration award under the MUAA may be vacated for a "mistake so gross as to work manifest injustice" or for a "manifest disregard" of the law remains an open question. *See Prince George's County Educators' Ass'n*, 309 Md. at 105, 522 A.2d 931. *See also Stephen L. Messersmith, Inc.*, 313 Md. at 659 n. 2, 547 A.2d 1048.

**8.** As one of many examples, the Opinion and Award reads at pages 26–27, as follows:

As indicated, I am persuaded that the Side Letters amended a contract between the Parties. By their terms, the Side Letters constitute valid amendments. They are possessed of all the elements and formalities of a contract; and [appellee] represented to [appellant], and led it to believe, that there was a contract. I am persuaded that [appellant] had every right to require [appellee] to perform its obligations under the resulting contract. I reject [appellee's] intimations that Paragraph 3 of the [first Side Letter] did not bind the Parties to do anything. The question for interpretation is what the Side Letters obligated [appellee] to do.

tor, of appellee's duty to actually increase teacher salaries—that obligation was excused and appellant was entitled to damages. *See, e.g., Kahn v. Schleisner,* 165 Md. 106, 113, 166 A. 435 (1933) (where a promise is conditioned upon the happening of an event, the condition is dispensed with if the promisor prevents the event from happening). *See also Bushmiller v. Schiller,* 35 Md.App. 1, 368 A.2d 1044 (1977) (where a home buyer failed to make a good faith effort to satisfy the condition precedent of obtaining financing, seller was entitled to damages for the breach).

The arbitrator, however, determined that he was without authority to award damages. In this regard, the arbitrator concluded that, since the political and budget processes were completed for fiscal year 1993 and the revenues have been spent, any monetary damages would have to be paid from current or future fiscal years, which would "require authorization from the appropriate legislative bodies. Thus, it does not appear that there is *any* effective way for any forum other than the Board of Estimates to remedy [appellee's] breach of its obligation." Similarly, appellee argues that the arbitrator's factual finding that the Board of Estimates did not appropriate funds for the pay increase precluded the arbitrator from fashioning a remedy. In this regard, the arbitrator was not empowered to appropriate taxpayer funds to provide a remedy because this would be in contravention of the "virtually unfettered authority [that] the Board of Estimates has over the budget." Furthermore, appellee argues that "the arbitrator was required to keep within the limits set by law. Those limits included the State law making salaries of teachers subject to the approval of the City. See Maryland Education Code Annotated § 4–304(a)(3)." With all of these assertions, we disagree.

In this case, as in *Snyder,* both appellee and the arbitrator have an "unduly restrictive view of [the arbitrator's] jurisdiction." *See Snyder,* 79 Md.App. at 39–40, 555 A.2d 523. Preliminarily, we observe that the arbitrator made the critical mistake of believing that "[t]o require the City, retroactively, to pay the parity increase assumes the very determination as

to revenue identification and priorities which the Side Letters did not require." Although it is true that the Side Letters conditioned the payment of wage increases on the identification of funds, appellee's failure to satisfy its good faith obligation to identify funds resulted in the condition being excused, as we just pointed out. The practical effect, therefore, is as if the condition precedent never existed in the first place. As a result, in awarding a remedy, the arbitrator should not have been concerned by the fact that revenues remained unidentified.

The arbitrator made a second critical mistake in concluding that "[n]either the Agreement nor the general provision of the Code g[a]ve [him] authority to order the appropriation of taxpayer funds. That is the exclusive prerogative of the legislature." We fail to see why appellee's breach of contract in this case should be treated differently than any other instance when a municipality (or any other party for that matter) breaches a contract. Municipalities and counties are routinely sued for breach of contract and held answerable for contract damages. *American Structures, Inc. v. Mayor & City Council of Baltimore*, 278 Md. 356, 359–60, 364 A.2d 55 (1976). "Municipal contracts, particularly those made in furtherance of the proprietary functions of a municipality, are controlled by the same rules of construction as are applicable to the contracts of private corporations and individuals." *City of Frederick v. Brosius Homes Corp.*, 247 Md. 88, 92, 230 A.2d 306 (1967). *See also Anne Arundel County v. Crofton Corp.*, 286 Md. 666, 673, 410 A.2d 228 (1980).

Under the reasoning of the arbitrator and appellee, binding and final arbitration is rendered utterly impotent. The arbitrator determined that a contract existed, that appellee breached it, but that appellant was not entitled to a remedy. Such a result frustrates the very purpose of binding arbitration, and can only be described as a gross mistake resulting in manifest injustice.

Additionally, we disagree with appellee that MD.CODE ANN., EDUC. § 4–304(a)(3) (1989) divested the arbitrator of the

power to award contract damages in this case. Section 4–304 reads as follows:

(a) *Powers.*—Subject to the applicable provisions of this article, the Board of School Commissioners of Baltimore City may:

(1) Examine, appoint, and remove teachers;

(2) Set teacher qualifications;

(3) Subject to the approval of the Mayor and City Council, set teacher salaries;  and

(4) Select textbooks for the public schools in Baltimore City, except that the textbooks may not contain anything of a sectarian or partisan character.

(b) *Duties.*—(1) The Board of School Commissioners shall report annually to the State Board on the condition of the schools under its jurisdiction.

(2) The report shall include a statement of:

(i) Expenditures;

(ii) The number of children taught;  and

(iii) Any other statistical information the State Board requires.

For three reasons, § 4–304(a)(3) does not operate as appellee suggests. First, § 4–304 generally defines the "Powers" and the "Duties" of the Board of School Commissioners as limited by the Education Article. Subsection (a)(3) specifically defines the salary setting "Powers" of the Board of School Commissioners as limited by both the Education Article and the Mayor and City Council of Baltimore City. Thus, this provision focuses on what the Board of School Commissioners can and cannot do in relation to the Education Article, generally;  and in relation to the Education Article and Mayor and City Council, specifically with respect to setting teacher salaries. The provision does not define the arbitrator's power to provide remedies for the breach of salary agreements between the appellee and its teachers. Second, the arbitrator, by ordering a remedy, is not compelling the Board of School Commissioners to "set teacher salaries." Rather, such an

order compels appellee to follow procedure to set teacher salaries. After all, the arbitrator found that a valid wage contract previously existed between appellee and appellant. Third, MD.CODE ANN., EDUC. § 6–408(a)(2) specifically allows agreements for the employment of public school teachers to provide for binding arbitration of grievances. Binding arbitration would certainly lose much of its utility if the arbitrator could not issue a remedy for a breach of such an agreement.

Thus, despite the large degree of deference afforded to an arbitrator, the arbitrator's failure to provide a remedy for the breach would normally warrant the vacation or correction of his Opinion and Award. "Arbitrators have broad discretion in fashioning a remedy for the injustice which is found to have occurred." *Baltimore County,* 329 Md. at 708, 621 A.2d 864. The record reflects, and the arbitrator acknowledged, that appellant "offer[ed] for consideration a number of alternative calculations" for determining a monetary award for appellee's breach.

In light of the foregoing, the circuit court was not legally correct in granting summary judgment against appellant and in favor of appellee on the first alternative ground. Ordinarily, we would be compelled to reverse the circuit court and remand this case to the arbitrator to fashion an appropriate remedy for the breach. Because in Part II of this opinion we hold that the circuit court was legally correct in granting summary judgment as it did based on the second alternative ground, however, we shall not reverse the circuit court.

## II

Next, we must determine whether the trial court was legally correct in entering summary judgment against appellant and in favor of appellee based on the second alternative ground. As we noted, the second alternative ground was that, since there was no genuine dispute of material fact, the Board of Estimates did not appropriate the money for the wage increase, there was not a final approval of the wage increase

agreement for fiscal year 1993, and thus, a valid and binding contract did not exist between the parties.

If this assertion is correct—namely, that a valid contract never existed between the parties—then the circuit court must have necessarily (albeit implicitly) determined that the arbitrator manifestly disregarded the law or committed a "palpable mistake" or a "mistake so gross as to work manifest injustice" in determining that a valid contract existed. Although the circuit court provided no explanation, this must be the case since there is no doubt that the arbitrator found that a valid and binding contract existed between the parties. In other words, for the circuit court to grant summary judgment against appellant and in favor of appellee on this ground, it had to disagree with the arbitrator's finding of a valid contract. This disagreement, however, did not result in the modification or vacation of the arbitration award because the arbitrator ultimately concluded that appellant was not entitled to any relief. Stated differently, because the outcome in arbitration was identical to the outcome in the circuit court (though based on different grounds) the circuit court could leave the arbitrator's award intact.[9]

---

9. When it raised the argument before the circuit court that a valid and binding contract never existed between the parties, appellee was not challenging the validity of the arbitrator's findings, even though, as we explained above, the Opinion and Award clearly reflects that the arbitrator found a valid and binding contract. Rather, appellee maintained that the arbitrator "reached the opposite conclusion" and determined that a valid and binding contract did not exist. Most probably because appellee was under this mistaken belief, appellee did not cross-appeal from the Opinion and Award, challenging the finding of a valid contract, but maintaining that the arbitrator ultimately reached the correct outcome. Nonetheless, it was within the circuit court's power to render a determination in this regard. *See, e.g., C.W. Jackson & Assocs., Inc. v. Brooks*, 289 Md. 658, 666–67, 426 A.2d 378 (1981) (Under the MUAA, the circuit court is an equity court empowered to adjust and determine all rights of the parties, and will ordinarily retain such power for all purposes, deciding all issues raised by the subject matter of the dispute, and awarding complete relief, even as to matters over which it would not have taken jurisdiction originally) (citing non-Uniform Arbitration Act cases). *Cf., Chillum–Adelphi Volunteer Fire Dep't*, 242 Md. at 517, 219 A.2d 801 ("A court does not act in an appellate capacity in reviewing the arbitration award, but enters judg-

As a result, our review of this issue is limited under the above principles of judicial review to whether the arbitrator's determination that a legally binding wage contract existed between the parties should be set aside. As we alluded to in the closing paragraph of Part I, we agree with the circuit court that the arbitrator erred in determining that a valid contract existed, and that this error was "so gross as to work manifest injustice."

As we shall explain, our holding is required under *Mayor & City Council of Baltimore v. American Fed'n of State, County & Mun. Employees,* 281 Md. 463, 379 A.2d 1031 (1977) (*AFSCME*), and *Baltimore Teachers Union v. Mayor & City Council of Baltimore,* 6 F.3d 1012 (4th Cir.1993) (*BTU*). These cases fully support appellee's position that a legally binding contract between appellee and appellant did not exist because the Board of Estimates never appropriated the funds for the wage increase.

*AFSCME* is a Court of Appeals case that comprehensively examines the role of the Board of Estimates in the appropriation process of Baltimore City. In *AFSCME,* various employee organizations (unions) exclusively represented certain Baltimore City employees pursuant to the provisions of the Municipal Employee Relations Ordinance (MERO) of the Baltimore City Code. *AFSCME,* 281 Md. at 466, 379 A.2d 1031. Following negotiations in 1976, each union executed a "Memorandum of Understanding" (memorandum) with the Board of Estimates covering the two-year period from July 1, 1976 to June 30, 1978. *Id.* The memoranda provided pay raises in each of the two years. *Id.* In addition, each memorandum contained the following preamble:

To the extent that implementation of these points requires action by the City Council, this memorandum will

---

ment on what may be considered a contract of the parties, after it has made an *independent determination* that the contract should be enforced. . . . The trial court was exercising common law jurisdiction. . . .") (emphasis added) (non-MUAA case).

serve as a request and recommendation to such body that it be so implemented.

For the first contract year, the Board of Estimates included in its Ordinance of Estimates [10] that was submitted to the City Council appropriations sufficient to cover the pay increases. *Id.* at 467, 379 A.2d 1031. The Ordinance of Estimates for the second contract year, however, did not include appropriations for the pay increase for that year. *Id.* "Because, under the Baltimore City Charter, the City Council may neither increase any appropriation in the proposed Ordinance of Estimates nor include any new appropriations, the action of the Board of Estimates precluded the payment of annual increments to city employees." *Id.*

The unions contended that the memoranda constituted binding two-year contracts with the Board of Estimates, and that MERO authorized these contracts. *Id.* In this regard, the unions maintained that the agreements obligated the Board to include in the Ordinance of Estimates appropriations sufficient to cover the pay increase. *Id.* at 467–68, 379 A.2d 1031. The City, however, denied that the Board was contractually obligated to include the appropriations in the Ordinance of Estimates, arguing that the memoranda did not constitute a binding contract. *Id.* at 468, 379 A.2d 1031. Alternatively, the City contended that, under the terms of the memoranda, the parties intended that the pay increase promises were conditioned upon the Board's discretion to withhold payment of the pay increases in any contract year for financial reasons. *Id.* Finally, the City argued that, if the memoranda required the Board to appropriate the money for the pay increase, the memoranda would be invalid because "a municipality 'may not contract so as to deprive itself of powers conferred upon it' by its charter." *Id.* at 468, 379 A.2d 1031.

The unions filed suit and the Baltimore City Court agreed with their position, issuing an injunction requiring the Board

---

**10.** The Ordinance of Estimates and the budget process is more fully explained below.

to submit to the City Council an amended Ordinance of Estimates containing the appropriations. *Id.* at 465, 379 A.2d 1031. The City appealed to this Court, but the Court of Appeals granted a writ of certiorari before proceedings commenced here. *Id.*

Before resolving the dispute, the Court of Appeals reviewed the role of the Board in the appropriation process as provided in the Charter of Baltimore City. The Court of Appeals comprehensively delineated the mechanism by which appropriations become law:

The City of Baltimore, like the State of Maryland, has what is commonly known as an "executive budget system." At the heart of the City's system is the Board of Estimates which is composed of the Mayor, the President of the City Council, the Comptroller, the City Solicitor, and the Director of Public Works. Charter, Art. VI, § 1. Under the City Charter, the Board of Estimates is vested with broad discretionary powers concerning the City's fiscal management. The Board is "responsible for formulating, determining, and executing the fiscal policy of the City . . . ." Art. VI, § 2(a). Accordingly, it is required to submit to the City Council for each fiscal year a proposed Ordinance of Estimates, Art. VI, § 2(b). The proposed ordinance must contain "[e]stimates of appropriations needed for the operations of each municipal agency," estimates for appropriations for other purposes, and a separate listing of appropriations needed for capital improvements, Art. VI, §§ 2(c)(1), (2). Accompanying the proposed Ordinance of Estimates must be "[a] breakdown of the amounts stated for each . . . purpose . . . of each municipal agency," including information concerning "the compensation of every officer and salaried employee of the City," Art. VI, § 2(f)(1). The Board also must submit comparisons between the appropriations actually contained in the ordinance for each agency with the appropriation requested by the agency, as well as the amounts appropriated for the current fiscal year compared to the amounts expended in the prior year, Art. VI, § 2(f)(2). Detailed information as to the source of funding

for the appropriations must be submitted, Art. VI, § 2(f)(3). And the Mayor must send to the Council a message "explaining the major emphasis and objectives of the City's budget for the next ensuing fiscal year." Art. VI, § 2(f)(6).

The City Council has only limited powers in relation to the proposed Ordinance of Estimates. It "may reduce or eliminate any of the amounts fixed by the Board in the proposed Ordinance of Estimates...." However, the City Council does not have "the power to increase the amounts fixed by the Board or to insert any amount for any new purpose in the proposed Ordinance of Estimates," Art. VI, § 2(g). After the passage of the Ordinance of Estimates by the City Council, the Board of Estimates must certify to the City Council the difference between the anticipated expenditures contained in the ordinance and expected revenues other than those from the property tax. The Board must then state a property tax rate sufficient to meet this difference and the City Council must by ordinance set a property tax rate not less than that stated by the Board so as to insure a balanced budget, Art. VI, § 2(g). Once funds are appropriated, they may not be "diverted or used for any purpose other than that named in said ordinance," except under certain circumstances requiring the approval of the Board of Estimates, Art. VI, § 2(i).

*Id.* at 468–70, 379 A.2d 1031.

According to the Court of Appeals, "It is the Board of Estimates which is initially required to review the financial status of the City on an annual basis and to determine, in its sole discretion, which items should be included in the City budget." *Id.* at 471, 379 A.2d 1031. The Court of Appeals also stated that "if the Board determines, in its judgment, that an appropriation for a certain purpose should not be included in the budget, this determination is final, as the City Council is without power to include any new item in the Ordinance of Estimates." *Id.* The Court further explained:

Consequently, under the Baltimore City Charter, the Board of Estimates plays a critical role in the appropriation process. The submission by the Board of Estimates to the

City Council of the Ordinance of Estimates is not merely a request or a recommendation for an appropriation of funds. Instead, the Board finally determines the maximum appropriation for any particular purpose. The Board's submission of the Ordinance of Estimates is, therefore, an integral part of the law-making function.

*Id.*

Turning to the facts in *AFSCME*, the Court of Appeals recognized that "the Board attempted to bind itself to include in the Ordinance of Estimates sufficient appropriations for payment of the annual [pay] increments." *Id.* The Court determined, however, that the Board was without authority to do so under MERO. *Id.* According to the Court of Appeals, MERO "is made expressly subject to the City Charter provision governing public employment and fiscal practices." *Id.* at 472, 379 A.2d 1031. Additionally, MERO states that any memorandum of understanding between the employer and union is subject to the provisions of the City Charter. *Id.* Furthermore, MERO requires that labor negotiations be conducted between the union and a *committee named by the Mayor*—not between the union and the Board. *Id.* at 472–73, 379 A.2d 1031. Finally, the Court of Appeals recognized that MERO treated memoranda of understanding as recommendations to the Board. *Id.* at 473–74, 379 A.2d 1031. Consequently, the Board's final approval of appropriations recommendations occurs when the Board actually includes the appropriations in the Ordinance of Estimates. *Id.* at 474, 379 A.2d 1031. As a result, therefore, the memoranda accepted by the Board were not binding upon the Board, and the unions were not entitled to relief. *Id.*

Because the facts of the instant case are extremely similar to those in *AFSCME*, we are satisfied that the principles of *AFSCME* control the outcome of the instant case. Here, as in *AFSCME*, despite the Board's prior approval, the Board did not appropriate funds in the Ordinance of Estimates for the fiscal year 1993 wage increase. For the same reasons that the Board's attempt to bind itself to include in the Ordinance of Estimates sufficient appropriations to cover pay increases was

ineffective under the City Charter in *AFSCME*, the Board's similar attempt in the instant case is ineffective. In other words, just as the memoranda of understanding were not binding in *AFSCME* under the City Charter, the stamped-approved Side Letter is not binding here.

We recognize that *AFSCME* relied heavily on the provisions of MERO, which are not applicable here, in determining that the memoranda of understanding were not binding. From our reading of *AFSCME*, however, we believe that the Court of Appeals would have reached the same conclusion, based exclusively on the provisions of the City Charter, even had MERO not applied. Indicative of the fact that the result would have been the same is that the Court of Appeals recognized that MERO "is made expressly subject to the City Charter provision governing public employment and fiscal practices." *Id.* at 472, 379 A.2d 1031. "This would embrace the Charter provisions vesting in the Board of Estimates the duty of determining, according to the standard set forth in the Charter, the maximum limits of appropriations for particular purposes in the Ordinance of Estimates submitted to the City Council." *Id.* Furthermore, the Court of Appeals held:

> Considering this language [of MERO providing that agreements contained in memoranda of understanding are recommendations to the Board] *and the provisions of the City Charter together*, it is reasonable to conclude that final "approval" by the Board of Estimates of recommendations requiring appropriations will only take place by the Board's including such appropriations in the Ordinance of Estimates.

*Id.* at 474, 379 A.2d 1031 (emphasis added). Thus, it reasonably appears that *AFSCME*'s holding applies in full force to the instant case, regardless of the fact that MERO is not involved in this case.

As a result, the language in *AFSCME* relating to the finality of the Board's decision to appropriate or not to appropriate funds in the budget is determinative of this issue. *AFSCME* makes clear that the Board "finally determines the

maximum appropriation for any particular purpose." *AFSCME*, 281 Md. at 471, 379 A.2d 1031. *See Baker v. Mayor & City Council of Baltimore*, 894 F.2d 679, 681 (4th Cir.1990) ("The Board's determination to exclude an appropriation for a given purpose, *e.g.*, an agency position, is final."). Thus, without the appropriation, the Side Letter wage agreement, like the memoranda of understanding in *AFSCME*, was never really an agreement at all, the Board's stamp of approval falling short of actual appropriation. In other words, under *AFSCME*, the Side Letter wage agreement was not binding unless and until the Board actually included the appropriations to fund the wage increase in the Ordinance of Estimates and the City Council passed the Ordinance of Estimates pursuant to the Baltimore City Charter.

In addition to *AFSCME*, *BTU*—a fairly recent United States Fourth Circuit Court of Appeals case—supports our holding. In *BTU*, Baltimore City implemented one-percent salary reductions for city employees, including public school teachers, in response to budgetary shortfalls. *BTU*, 6 F.3d at 1014. The Baltimore Teachers Union (union) filed suit under the Contract Clause of the U.S. Constitution against the City in the United States District Court for the District of Maryland, alleging that the pay cuts were an impermissible impairment of their employment contracts with the City. *Id.* The District Court ruled in the union's favor, and the City appealed. *Id.* The Court of Appeals for the Fourth Circuit agreed "that the City substantially impaired an extant contract with its teachers . . .", but concluded that, "affording the requisite degree of deference to the City's legislature . . . the impairment was in exercise of the City's legitimate powers and thus permissible under the Contract Clause." *Id.* at 1015. In so doing, the Fourth Circuit Court of Appeals made certain observations that support appellee's position.

First, the Court stated:

We have little trouble concluding, as did the district court, that Baltimore intended to and did enter into contractual relationships with its teachers and police, *at least upon enactment into law of the Ordinance of Estimates. Upon*

*enactment of the Ordinance [of Estimates], the City Council formally ratified the essential agreement between the City and its employees embodied in the memoranda of understanding and authorized funding for the City's obligations under those memoranda.*

*Id.* (citations omitted) (emphasis added). In addition, the Fourth Circuit Court of Appeals explained:

[T]he Contract Clause does not ... require the courts—even where public contracts have been impaired—to sit as superlegislatures, determining, for example, whether it would have been more appropriate instead for Baltimore to close its schools for a week, an option actually considered but rejected, or to reduce funding to the arts, as [the union] argue[s] should have been done. Not only are we ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives; we have no objective standards against which to assess the merit of the multitude of alternatives.

*Id.* at 1021–22.

As the above-italicized language plainly indicates, it is not until the enactment of the Ordinance of Estimates that the City Council formally ratifies an agreement between the City and its employees. In other words, the above language makes clear that the City enters into contractual relationships with its teachers only upon enactment into law of the Ordinance of Estimates. Thus, because the Ordinance of Estimates in the instant dispute did not contain appropriations for the parity increase, there was not a final and binding agreement to increase the teachers' pay in this regard. Although we recognize that *BTU* deals with the constitutional issue of whether the City impaired various employment contracts under the Contract Clause—an entirely different analysis than a breach of contract claim [11]—much of the language in *BTU* is instructive here.

---

11. To determine whether the government has violated the Contract Clause of the U.S. Constitution, the following must be determined: (1)

Appellant, however, argues as follows that reliance on *BTU* is inappropriate:

> [Appellee] also argues that an arbitrator or court must not act as a super legislature. ... That concern is not at issue here where the relevant legislative body blessed the contractual instrument and it [sic] content. In [*BTU*], the Union was challenging a wage *cut* approved by the Board of Estimates. Here, [appellant] seeks to *enforce* an instrument approved by the Board of Estimates. *Accord Baker v. Mayor and City Council of Baltimore,* 894 F.2d 679, 682 (4th Cir.1990) (cited for the proposition that the Board has broad discretionary powers whether or not to adopt fiscal policy—not whether a policy once adopted must be enforced). [Appellant] seeks simply to enforce an official action taken by the Board of Estimates, an action never rescinded, altered or rejected later by the Board of Estimates.

The obvious retort to this assertion, of course, is that it is only "[u]pon enactment of the Ordinance [of Estimates], [that] the City Council formally ratifie[s] the essential agreement between the City and its employees embodied in the memoranda of understanding and authoriz[es] funding for the City's obligations under those memoranda." *Id.* at 1015.

In addition, in its reply brief and during oral argument, appellant strenuously argued that *Fraternal Order of Police v. Baltimore County,* 340 Md. 157, 665 A.2d 1029 (1995) (*FOP*)—a very recently decided case from the Court of Appeals—supports its position that a contract existed between the parties and that appellant is entitled to a remedy. We, however, find *FOP* to directly cut against appellant's position.

In *FOP*, Baltimore County entered into a collective bargaining agreement with its police officers' union for fiscal year

---

whether there has been an impairment of a contract; (2) whether state law has actually operated to substantially impair a contractual relationship; and (3) whether, assuming a substantial impairment, that impairment is permissible as a legitimate exercise of the government's sovereign powers. *BTU,* 6 F.3d at 1015.

1992. *Id.* at 160, 665 A.2d 1029. This agreement contained a provision prohibiting the furlough of police officers during that year. *Id.* Subsequent to the County Executive's signing of the agreement, the County Executive submitted the budget for fiscal year 1992 to the Baltimore County Council, which enacted the budget. *Id.* at 161, 665 A.2d 1029. Included in the 1992 budget were appropriations for the full wages and benefits of the police officers as provided in the agreement. *Id.* In January 1992, despite the agreement's furlough prohibition provision, the County enacted a five-day furlough plan for all County employees, including police officers. *Id.* The police officers' union objected and the matter ultimately proceeded to arbitration, where the union sought reimbursement of lost wages resulting from the furlough plan. *Id.* Finding that the County breached the agreement, the arbitrator ordered that the police officers be reimbursed for lost wages. *Id.* at 162, 665 A.2d 1029. The County filed a petition in circuit court to vacate the arbitrator's award. *Id.* Among other things, the circuit court ruled that the County had impermissibly delegated its budget-making authority (including compensation-setting authority) by submitting to an arbitrator the issue of whether the County breached the agreement. *Id.* at 163, 665 A.2d 1029. The Court of Appeals granted certiorari before this Court heard the matter. *Id.* at 163–64, 665 A.2d 1029.

The Court of Appeals reversed the circuit court, holding that the arbitrator correctly determined that the County breached its contract. *Id.* at 164, 171, 665 A.2d 1029. In so doing, the Court recognized that the County works under an "executive budget system." *Id.* In many respects, the County's budget system is very similar to the City's. Under the County system, the County Executive must submit the budget to the Council for approval or disapproval of the appropriations made therein. *Id.* at 165, 665 A.2d 1029. Agreements between the County and its employees are made in advance of that submission and appropriations are fully subject to the County's annual budget process. *Id.* at 166, 665 A.2d 1029.

The following portion of *FOP*'s holding speaks directly to the central issue of the instant case:

> Simply put, there was no violation of the Charter in this case [when the arbitrator determined that the County breached its agreement and was liable to the police officers]. The County Executive and County Council exercised their appropriation function under the Charter. *The annual budget enacted by the Executive and Council could have appropriated less money for police officers than the collective bargaining agreement called for and could have provided that the shortfall be made up by furloughs of police officers. If the enacted annual budget had done this, the budget provisions, and not the collective bargaining agreement's terms, would prevail under our [prior] opinions....* But the enacted annual budget for fiscal 1992 did not appropriate less money for police officers' compensation than contemplated by the collective bargaining agreement. The arbitrator's decision did not alter the amount of compensation set forth in the budget. Rather, the arbitrator determined only that the County had violated the terms of the contract which it had made, and that the County should pay to the police officers the compensation that had already been appropriated in the annual budget pursuant to the County Charter.

*Id.* at 171, 665 A.2d 1029 (emphasis added). The obvious import of the Court's teaching in *FOP* can be summed up as follows: If the final enacted budget contains the agreed upon appropriations from which compensation should have been paid, then the County or City is obligated to pay; but, if the final enacted budget contains less appropriations than were previously agreed upon, then the budget controls and the County or City is only liable up to the amount actually appropriated. In our case, appellant and appellee entered into an agreement for a wage increase, but the money to cover the wage increase was not specifically appropriated in the final enacted budget. Therefore, under *FOP*, there was not a final binding contract under which appellee is liable.

■ Before concluding, we shall address appellant's suggestion that Section 65(b) of Article VII of the Baltimore City Charter somehow renders the wage parity agreement for fiscal year 1993 final and binding upon appellee. This provision reads, in pertinent part, as follows:

The salaries of superintendents, assistant superintendents, directors, supervisors, assistant supervisors, principals, assistant principals, *teachers*, secretaries, clerks and employees shall be fixed by the Board [of School Commissioners], not to exceed in the aggregate the amount appropriated for such personnel in the Ordinance of Estimates; ... The Board [of School Commissioners], in submitting its budget each year, shall also include a maximum compensation scale for superintendents, assistant superintendents, directors, supervisors, assistant supervisors, principals, assistant principals, *teachers*, and all other employees ... and no increase above the maximum scale shall be made during the ensuing year without the approval of the Board of Estimates.

BALTIMORE CITY CHARTER, Art. VII, § 65(b) (1994) (emphasis added).[12] We do not believe that this provision operates in the manner in which appellant suggests. Rather, we find § 65(b) to be completely supportive of our holding. Section 65(b) makes clear that no increase in teacher salaries above the maximum scale shall be made during the ensuing fiscal year without the Board of Estimate's approval. Under *AFSCME* and *BTU,* "approval" occurs when the Board of Estimates actually includes the pay increase in the Ordinance of Estimates. Thus, because the pay increase was not included in the Ordinance of Estimates in the instant case, the Board of Estimates never formally gave its "approval" as was required under § 65(b).

Based on the foregoing, we hold that the fiscal year 1993 wage parity agreement, as embodied in the Side Letters, was

---

12. Section 65(b) was formerly codified as § 59(b) in the 1964 version of the Baltimore City Charter. The 1994 codification is nearly identical to the 1964 version.

not a final and binding agreement. As a result, the arbitrator erred in determining that a binding and valid agreement existed between the parties. The consequence of this mistake is extremely severe. It results in the subversion of the internal governmental and political operations and procedures of appellee as set forth in the City Charter. In our opinion, this is a mistake so gross as to work manifest injustice. Consequently, the circuit court correctly determined, based on the second alternative ground, that summary judgment should be granted in favor of appellee and against appellant. We therefore affirm the circuit court's ruling in this regard.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**