

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00074-CV

CHOICE HOTELS INTERNATIONAL, INC., Appellant

V.

ONKAR LODGING, INC., HARBHAJAN NAHAL, AND MALJINDER SINGH, Appellees

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 15C0621-202

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

In June 2017, Choice Hotels International, Inc. (Choice), on one side, and Onkar Lodging, Inc., Harbhajan Nahal, and Maljinder Singh (collectively Onkar or Onkar Parties), on the other, arbitrated a franchise agreement dispute before a panel of American Arbitration Association (AAA) arbitrators in Maryland. In August 2017, the AAA panel denied Onkar's claims and awarded Choice costs and fees. Onkar thereafter sought to vacate the arbitration award in a Bowie County lawsuit, while Choice sought to confirm it. In an order dated September 13, 2018, the trial court denied Choice's motion to confirm the arbitration award and ordered that the parties arbitrate within ninety days of the date of its order, with JAMS, a private alternative dispute resolution provider.[1]

Choice appeals the trial court's order,[2] claiming that the trial court erred (A) in denying confirmation of the arbitration award in the absence of any statutory grounds for vacatur or any contract defenses under state law to void the parties' arbitration contract and (B) in ordering a new arbitration before a new arbitration provider, thereby effectively rewriting the parties' arbitration agreement. We find that the arbitration award should have been confirmed because (1) no grounds for vacatur were proven and (2) the arbitration contract was enforceable. We therefore reverse the judgment and render judgment confirming the award.

The complex background of this case bears some detailing.

---

[1]On November 6, 2018, this Court issued its order staying all proceedings in the trial court including, but not limited to, the court-ordered JAMS arbitration in Dallas, pending this Court's decision on appeal. The trial court's order also (1) denied Choice's motion for summary judgment, (2) denied Onkar's motion for partial summary judgment, and (3) continued the October 2, 2018, trial date.

[2]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.098(a)(3) (providing for appeal of order confirming or denying confirmation of arbitration award).

Onkar has operated a Comfort Suites hotel in Texarkana, Texas, since 2005 pursuant to a twenty-year franchise agreement (the Agreement) that the parties executed on October 18, 2005, in Silver Spring, Maryland. In 2007, Choice executed an additional franchise agreement with a different party in Texarkana, Arkansas, providing for the operation of a Comfort Inn & Suites hotel. The Comfort Inn & Suites hotel was never constructed. Consequently, in 2011, Choice terminated the Comfort Inn & Suites franchise. Choice then issued a new franchise license to replace the Comfort Inn & Suites hotel with a Comfort Suites hotel.[3] This replacement franchise license generated the parties' dispute here.

In May 2015, Onkar filed a lawsuit against Choice in Bowie County alleging breach of contract and fraud. Among other things, Onkar complained that Comfort Suites was not the "same brand" as Comfort Inn & Suites and, therefore, Choice had no right, under the Agreement, to replace the Comfort Inn & Suites franchise with another Comfort Suites franchise within Onkar's "area of enhanced protection" (Protected Area).

Choice responded by filing a general denial answer and a motion to enforce the Agreement's arbitration clause.[4] The trial court ordered arbitration, which was conducted for three days before the AAA panel.

In its decision, the arbitration panel determined that Choice had neither breached the Agreement nor committed "fraud by representation and omission." Those claims were primarily

---

[3]The "replacement" Comfort Suites opened for business in 2013.

[4]The Agreement includes a mandatory arbitration clause for all claims arising under the Agreement other than claims by Choice for indemnification or actions seeking to enjoin use of the Choice trademarks in violation of the Agreement.

based on certain provisions of the Agreement and the associated Choice Hotels International Incremental Impact Policy (Policy), discussed below.

The Agreement was subject to the Policy. Paragraph 21(b) of the Agreement provides:

> You agree that this Agreement relates only to the Hotel and the Location. Subject to the terms of our Impact Policy in force from time to time: (1) we may own, operate, franchise or license other hotels using the Marks and the System, as well as hotels using any other brand, at any other location, and (2) we, our affiliates and other franchisees may now or in the future engage in transient lodging or related business activities that may compete with the System or with the Hotel.

The Impact Policy identifies areas of "enhanced protection."[5] Section II of the Policy states, in pertinent part, "Except as set forth below, Choice will not grant a franchise for a same-brand hotel within your hotel's Area of Enhanced Protection." Section V of the Policy explains when Choice can replace a same-brand hotel within the Protected Area:

> **V.      Choice's Right to Replace Franchises**
>
> Notwithstanding the Area of Enhanced Protection granted in Section II or the additional rights of exclusion granted in Sections III and IV, Choice reserves the right to replace any franchise which has departed or which is scheduled to depart from a Choice brand system ("departed/departing franchise") with a same-brand franchise, located anywhere within the Area of Enhanced Protection of the departed/departing franchise. Choice, however, will not grant a replacement franchise if it is to be located within the Area of Enhanced Protection of a same-brand hotel in good standing, unless the departed/departing franchise was/is already located in such same-brand hotel's Area of Enhanced Protection.

Finally, the Policy provides,

---

[5]The area of "enhanced protection" is defined in the Policy relative to the hotel's "appropriate market category" and "is expressed in terms of radial miles from [a] hotel." It is undisputed that the new franchise for a Comfort Suites hotel was within Onkar's Protected Area.

## VI.    Scope and Term of This Policy

This Policy shall apply to all Choice hotels that are part of the Clarion, Comfort, Quality, Sleep, Econo Lodge, Rodeway, or MainStay brands (including all hotels that are part of any sub-segment of those brands, such as Comfort Suites, for example) and that are located in the United States of America (including all not-yet-operating hotels that are subject to a Choice Franchise Agreement) and its provisions shall be in effect until such time this Policy is withdrawn, amended or modified. Any withdrawal, amendment or modification of this Policy shall be within Choice's sole discretion.

In concluding that Choice did not breach the Agreement, the arbitration panel reasoned:

The contract at issue is the Franchise Agreement as supplemented by the Policy. The latter sets forth the respective rights and duties of the parties in the event that Choice desires to award a Choice franchise near a current franchisee and the current franchisee objects. It provides certain protections to current franchisees. However, these protections are not extended when Choice is replacing a current franchise.

On June 28, 2011, Choice gave notice to Claimants that it had received an application for a Comfort Suites franchise within Claimants' area of protection. Choice asserted that the new hotel was a "replacement" hotel for a Comfort Inn & Suites that was approved but never built. . . . Claimants objected in writing to the new franchise on July 25, 2011. However, they did not follow the procedure set forth in the Policy required to request an incremental impact study which would have measured the potential impact on Claimants' revenue of the new hotel. . . . The Policy allows Choice to replace a departed hotel with one of the same brand. Claimants take the position that "Comfort Suites" and "Comfort Inn and Suites" are two different brands while Choice maintains that "Comfort Suites," "Comfort Inn and Suites," and "Comfort Inn" are the same brand. Claimants produced some evidence that Comfort Suites is a separate brand, e.g., Choice's website lists Comfort Suites separately from the other Comfort hotels and Comfort Suites has a color scheme and logo different from Comfort Inn. Choice points to its management of all Comfort properties within one unit and the uniform design, except for the logo and color, of the exterior of new buildings. The Policy itself is the most persuasive proof on this subject. Section VI, "Scope and Term of this Policy," provides:

This Policy shall apply to all Choice hotels that are part of the Clarion, Comfort, Quality, Sleep, Econo Lodge, Rodeway, or MainStay brands (including all hotels that are part of any subsegment of those brands, such as Comfort Suites, for

example) and that are located in the [U.S.A.] (including all not-yet operating hotels that are subject to a Choice Franchise Agreement) . . . .

. . . Section V defines a "departed/departing franchise" as "any open hotel, executed franchise agreement or approved franchise application." Thus, the Comfort Inn & Suites that was granted a franchise but never built meets the definition of a departed franchise, and Choice was entitled to replace it with a new Comfort Suites, a subsegment within the Comfort brand.

The panel concluded that, because Comfort Suites is a subsegment of the Comfort brand, Choice did not breach the Agreement by granting a new franchise for a Comfort Suites within Onkar's Protected Area, effectively replacing the Comfort Inn & Suites franchise with a Comfort Suites franchise. The panel further opined that, even if there had been a breach of contract, Onkar failed to prove that Onkar's revenue losses were due "solely and directly to the claimed breach of contract." Finally, the panel concluded that the parties' dispute regarding the franchise replacement did not support a fraud claim. The panel stated, "Rather, we find that this is simply a contract dispute; the Claimants were not misled, and the fraud/misrepresentation claim is denied."

The following month, Onkar filed an amended petition against Choice, claiming, among other things, that Choice fraudulently induced Onkar to participate in a "sham," and thus invalid, arbitration. Onkar claimed the arbitration proceeding was void because the arbitrators failed to apply the substantive laws of the State of Maryland and Onkar was "fraudulently induced into the arbitration provision *ab initio*." Onkar claimed that the arbitration was not fair and impartial because the AAA and Choice "were engaged in a mutually beneficial relationship to the detriment of Choice's franchisees, whereby Choice would keep the AAA and its arbitrators busy . . . with

repeat business so long as the rulings were resolved in Choice's favor."[6]  Onkar claimed that, because "[t]he fix was in," there was "no chance at prevailing no matter [the] evidence, grievance, or damages."  The fraud claim appears to be based on their statement that,

> [h]ad Choice disclosed this sham and the certainty that Choice could violate any provision of its Franchise Agreement and any associated terms and conditions therewith with complete impunity, Onkar would have never consented to arbitration as its exclusive method of dispute resolution or entered into the Franchise Agreement to begin with.

Choice unsuccessfully moved to strike the amended petition and to dismiss the lawsuit.[7]

Onkar thereafter filed a motion for partial summary judgment on the claim for breach of contract. Choice filed a motion to confirm the arbitration award, claiming that Onkar's allegations that the arbitrators failed to apply the substantive laws of the State of Maryland and that Onkar was fraudulently induced into the arbitration provision[8] did not meet the standard for vacatur under the Maryland Arbitration Act.  Choice also filed a motion for summary judgment and supplemental motion to confirm the arbitration award.

---

[6]In its Bowie County lawsuit, Onkar claimed that its investigation revealed that, "of some 200 arbitrations which Onkar's counsel could locate from 2002 to 2017, Choice lost only *one* in 2008.  Investigation further revealed that the arbitrator, Laurence Schor, who issued the adverse ruling against Choice, was not again selected as an arbitrator for a Choice arbitration until 2017."  Onkar further claimed that each of the arbitrators selected for the Onkar arbitration had presided over several Choice arbitrations and that Choice prevailed in each of those arbitrations.  According to Onkar, "none of the arbitrators 'randomly' selected by the AAA and Choice wanted to meet Mr. Schor's fate.  This information was not made known to Onkar, and it was not until investigation by its counsel in litigation that this sham was brought to light."

[7]Choice also filed a motion to confirm the arbitration award in the Circuit Court of Montgomery County, Maryland. Onkar filed a motion seeking to enjoin Choice from further prosecuting its motion to confirm in the Maryland court. The trial court granted the temporary restraining order.  The parties resolved this issue by means of a Rule 11 agreement.

[8]In its response to Choice's motion to compel arbitration, Onkar claimed that the arbitration would not take place in a neutral forum because it compelled Onkar to arbitrate in Maryland.  Onkar also claimed the agreement was not enforceable due to lack of mutuality because it excepts trademark violation claims from arbitration.

Following a hearing in August 2018, the trial court denied Onkar's motion for partial summary judgment, Choice's motion for summary judgment, and Choice's motion to confirm the arbitration award. Instead, and without expressly vacating the arbitration award, the trial court ordered the parties to arbitration with JAMS in Dallas. This appeal followed.[9]

---

[9]Maryland law applies to all issues presented in this appeal. The Agreement's arbitration clause requires the arbitrators to apply Maryland substantive law. The Agreement's arbitration clause provides:

> **22.       Arbitration.** Except for our claims against you for indemnification or actions seeking to enjoin you from using the Marks in violation of this Agreement, any controversy or claim arising out of or relating to this Agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this Agreement is invalid, illegal, or otherwise voidable or void, as well as any claim that we violated any laws in connection with the execution or enforcement of this Agreement and any claim for declaratory relief, will be sent to final and binding arbitration before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules of the American Arbitration Association, including its rules for emergency measures of protection, except to the extent that the Commercial Rules of the American Arbitration Association may be interpreted to require you or us to produce documents, witnesses, or information at a time other than at a hearing on the claim without our mutual consent. In the event more than one demand for arbitration is filed in connection with this Agreement, the demand filed with the American Arbitration Association, J.A.M.S., or National Arbitration Forum office having jurisdiction over Maryland proceedings shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing. The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction. If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear. Any arbitration will be conducted at our headquarters office in Maryland. Nothing in this Section will be construed as requiring you or us to make a claim in arbitration before exercising any rights you or we may have to give notice of default or termination in accordance with the terms of this Agreement.

In addition, the entirety of the Agreement shall be interpreted under Maryland substantive law. Paragraph 20(f) provides:

> This Agreement becomes valid only when we have signed it, and it will be interpreted under the substantive laws of Maryland, not including its conflict of laws provision; except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchisee Registration and Disclosure Law.

Agreements affecting interstate commerce may also be subject to the Federal Arbitration Act (FAA). 9 U.S.C.A. §§ 1–16 (West, Westlaw current through P.L. 116-17). The Maryland Uniform Arbitration Act is, however, the state analogue of the FAA. *Walther v. Sovereign Bank*, 872 A.2d 735, 742 (Md. 2005). Under both the FAA and Maryland's Arbitration Act, the party moving to vacate the arbitration award bears the burden of proof. *See Jih v.*

8

*(1)     No Grounds for Vacatur Were Proven*

Written arbitration agreements entered under the laws of Maryland generally are governed by the Maryland Uniform Arbitration Act (the Act).  MD. CODE ANN. CTS. & JUD. PROC. §§ 3-201–3-234 (West, Westlaw through May 13, 2019); *see Coleman v. Columbia Credit Co.*, 42 Md. App. 198, 200–01 (1979) (agreement to submit dispute to arbitration sufficient to trigger application of the Act).  An agreement providing for arbitration confers jurisdiction on the court to enforce the agreement and enter judgment on the arbitration award.  MD. CODE ANN. CTS. & JUD. PROC. § 3-202.[10]

---

*Long & Foster Real Estate, Inc*., 800 F. Supp. 312, 317 (D. Md. 1992); *Baltimore Teachers Union, Am. Fed. of Teachers, Local 340 v. Mayor of Baltimore*, 671 A.2d 80 (Md. App. 1996) (citation omitted), *cert. denied*, 677 A.2d 565 (Md. 1996).  Onkar claims, and Choice does not dispute, that, due to the interstate nature of this matter—Choice is headquartered in Maryland and Onkar in Texas—the FAA likewise applies.  While the FAA arguably applies, the agreement specifically states that it is governed by Maryland law.  The United States Supreme Court has stated, "The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989) (citation omitted). Instead, "state law may . . .  be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id*. (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Judicial review of this matter is, therefore, properly conducted in accordance with Maryland law.  *See C & L Enter., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 419 (2001) (when agreement's choice of law clause provides that disputes will be resolved in accordance with state law, state's arbitration act governs issues concerning arbitration under the clause); *Rourke v. Alchem Prods., Inc.*, 835 A.2d 193, 209 (Md. App. 2003) (noting dispute met the interstate commerce requirement for the applicability of the FAA, but applying the act as dictated by the arbitration agreement choice of law provision).  In some circumstances, however, Maryland relies on federal precedent in interpreting its own statute. *See Holmes v. Coverall N. Am., Inc*., 649 A.2d 365, 368 (Md. 1994) (relying on federal cases interpreting the FAA in determining whether a dispute is arbitrable).

[10]Section 3-227 of the Act permits a party to petition the court to confirm the arbitration award.  That section provides:

**Petition to confirm award**

(a)     A party may petition the court to confirm the award.

**Confirmation of award**

(b)     The court shall confirm the award, unless the other party has filed an application to vacate, modify, or correct the award within the time provided in §§ 3-222 and 3-223 of this subtitle.

The "decision to grant or deny a petition to vacate or confirm an arbitration award is a conclusion of law, which we review without deference." *WSC/2005 LLC v. Trio Ventures Assocs.*, 190 A.3d 255, 260 (Md. 2018). "[A]rbitration is favored and encouraged in Maryland because it provides an informal, expeditious, and inexpensive alternative to conventional litigation." *Amalgamated Transit Union v. Lovelace*, 109 A.3d 96, 106 (Md. 2015) (citations omitted). Consequently, "judicial review of an arbitration award is very narrowly limited[.]" *Downey v. Sharp*, 51 A.3d 573, 585 (Md. 2012). "[C]ourts generally defer to [an] arbitrator's findings of fact and applications of law. Mere errors of law and fact do not ordinarily furnish grounds for a court to vacate . . . an arbitration award." *Id*. at 583.

The Act provides that a court may not vacate an award, or refuse to confirm an award, "on the ground that a court of law or equity could not or would not grant the same relief." MD. CODE ANN. CTS. & JUD. PROC. § 3-224(c). Rather, the Act sets forth five grounds on which a "court shall vacate" an arbitration award:

(1)     if the "award was procured by corruption, fraud, or other undue means";

(2)     if there "was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party";

(3)     if the "arbitrators exceeded their powers";

(4)     if the "arbitrators refused to postpone the hearing on sufficient cause being shown for the postponement, refused to hear evidence material to the controversy, or otherwise so

---

**Applications to vacate, modify, or correct award**

(c)     If an application to vacate, modify, or correct the award has been filed, the court shall proceed as provided in §§ 3-223 and 3-224 of this subtitle.

MD. CODE ANN. CTS. & JUD. PROC. § 3-227.

10

conducted the hearing, contrary to the provisions of § 3-213 of this subtitle, as to prejudice substantially the rights of a party"; or

(5)     if there "was no arbitration agreement as described in § 3-206 of this subtitle, the issue was not adversely determined in proceedings under § 3-208 of this subtitle, and the party did not participate in the arbitration hearing without raising the objection."

MD. CODE ANN. CTS. & JUD. PROC. § 3-224(b).

On appeal, Onkar claims that the arbitrators exceeded their powers by re-drafting the Agreement and failing to apply the substantive law of Maryland, as provided by the arbitration clause,[11] and that the arbitration panel manifestly disregarded the law. These arguments implicate

---

[11]The language of the amended petition is arguably broad enough to cover these grounds. It claimed:

The arbitration panel fatally failed to apply substantive Maryland law as required by the arbitration provision, by re-writing the Franchise Agreement and Incremental Impact Policy.

27.     The arbitration provision requires the arbitrators to apply substantive Maryland law. What they actually did could not be further from this requirement. Not only did they not apply Maryland law, but they applied no law known in the English speaking free world. As described above with relation to the breach issue, the panel simply re-drafted the Franchise Agreement giving it no meaning or interpretation conceivable or feasible under any known jurisprudence. In fact, Maryland law, like Texas, prohibits a court from enforcing an agreement as a party would like to have had it drafted, but must look first to the four corners of the agreement to determine if there is an ambiguity, and only then may it look at parole [sic] evidence. . . .

28.     Not surprisingly, the arbitrators made no finding that the Franchise Agreement and the incorporated Rules and Regulations and Incremental Impact Policy were ambiguous. This is because they are not ambiguous in the least. Only one interpretation can be given to what "same-brand franchise" means. "Comfort Suites" is an independent brand, and "Comfort Inn & Suites" is an independent brand. However, the panel cited multiple similarities of the two brands to make a finding that they were similar enough, clearly in violation of Maryland law and of the Franchise Agreement.

29.     The panel also stated in its analysis that Onkar failed to follow the procedure for objecting to the AR223 Comfort Suites franchise. However, THERE IS NO DUTY OR PROCEDURE FOR ONKAR TO OBJECT AT ALL!!! The panel simply created a contractual duty out of thin air. The entire matter is covered in paragraph 5 above. The only duty was on Choice to initiate an incremental impact study if it wanted to build a Comfort Suites within Onkar's Area of Enhanced Protection. Barring that election, Choice was absolutely prohibited from doing so without qualification, contingency, condition, excuse, justification, or otherwise.

11

the third statutory ground for judicial review of an arbitration award, claiming that the arbitrators exceeded their powers. The Maryland Court of Appeals has explained that "the issue of whether an arbitrator exceeded the arbitrator's authority is not the same as the issue of whether the arbitration award was rational or legally correct." *Prince George's Cty. Police Civilian Employees Ass'n v. Prince George's Cty. ex re. Prince George's Cty. Police Dep't*, 135 A.3d 347, 355 (Md. 2016).

This distinction is illustrated in *Downey*. In that case, the trial court granted a petition to confirm an arbitration award. That decision was reversed by the intermediate appellate court and was remanded with instructions to vacate several findings within the award because—according to the court—the arbitrator exceeded his authority by issuing a "completely irrational" award that was in "manifest disregard of the law." *Downey*, 51 A.3d at 581–82. The Maryland Court of Appeals held that the Court of Special Appeals' reliance on the statutory ground that the arbitrator exceeded his authority was misplaced. *Id*. at 582. It explained,

> [A]n issue or matter resolved by an award may be rational and legally correct but the arbitrator, under the arbitration agreement, may have had no power or authority to resolve the particular issue. On the other hand, an issue may have clearly been within the arbitrator's powers, but the arbitrator's resolution of the issue may have been irrational or manifestly erroneous as a matter of law . . . . Vacating an award because it is "completely irrational" or "manifestly in disregard of the law" is clearly different from vacating an award for one of the reasons delineated in § 3-224(b).

---

30. There was no justification or excuse for the panel to disregard well-established Maryland law, the letter of the contract, or to spontaneously write a different contract favorable to Choice, when the very arbitration provision empowering their authority in the first place expressly prohibited them from doing so.

The petition also stated that the "panel failed to apply substantive Maryland law as required by the arbitration provision, by creating a new standard of causation unrecognized in Maryland or American jurisprudence."

12

The court further clarified that "an arbitrator exceeds the arbitrator's authority by issuing an award that arises out of a contract that one party lacked the authority to enter." *Prince George's Cty. Police Civilian Employees Ass'n*, 135 A.3d at 356. This rule is aligned with earlier precedent that an arbitrator exceeds his powers by issuing an award where the underlying contract is invalid. *Bd. of Educ. of Charles Cty. v. Educ. Ass'n of Charles Cty.*, 408 A.2d 89, 93 (1979).

> The provisions and time constraints of [CJ §§] 3-227 and . . . 3-224 apply equally, whether the arbitration award is challenged on the ground that the underlying contract is invalid because of fraud or on the ground that the arbitrator exceeded his [or her] powers because the underlying contract was illegal . . . . [CJ §§] 3-224 and 3-227 establish an orderly mechanism whereby a court, not an arbitrator, makes the final determination of the legality of a contract before an arbitration award is enforced.

*Prince George's Cty. Police Civilian Employees Ass'n*, 135 A.3d at 356 (quoting *Bd. of Educ. of Charles Cty.*, 408 A.2d at 93).

The Maryland Court of Appeals has interpreted this statutory ground to coincide with the idea of jurisdiction—the power to act. The United States Supreme Court similarly interpreted the federal counterpart to this ground in *Oxford Health Plans LLC v. Sutter*, 133 S.Ct. 2064, 2067 (2013). Writing for the majority of the Court, Justice Kagan explained:

> Here, Oxford invokes § 10(a)(4) of the [Federal] Act, which authorizes a federal court to set aside an arbitral award "where the arbitrator[ ] exceeded [his] powers." A party seeking relief under that provision bears a heavy burden. It is not enough to show that the arbitrator committed an error—or even a serious error. Because the parties bargained for the arbitrator's construction of their agreement, *an arbitral decision even arguably construing or applying the contract must stand*, *regardless of a court's view of its (de)merits*. Only if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination. So *the sole question for us is whether the*

13

*arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.*

*Id.* (emphasis added) (citations omitted). In *Oxford Health Plans*, the Supreme Court discussed an argument addressing the merits of the arbitrator's decision: that the arbitrator had "badly misunderstood" a critical provision of the parties' contract. The Court stated:

> We reject this argument because, and only because, it is not properly addressed to a court. Nothing we say in this opinion should be taken to reflect any agreement with the arbitrator's contract interpretation, or any quarrel with Oxford's contrary reading. *All we say is that convincing a court of an arbitrator's error—even his grave error—is not enough. So long as the arbitrator was "arguably construing" the contract—which this one was—a court may not correct his mistakes* under [9 U.S.C.] § 10(a)(4). The potential for those mistakes is the price of agreeing to arbitration. As we have held before, we hold again: "It is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." The arbitrator's construction holds, however good, bad, or ugly. In sum, Oxford chose arbitration, and it must now live with that choice.

*Id.* at 2070–71 (emphasis added) (citations omitted).

*(a)*      *The Arbitrators Did Not Exceed Their Powers by Re-writing the Parties' Contract*

The dispute centers on the issue of whether, under the Agreement, Choice was permitted to replace a Comfort Inn & Suites with a Comfort Suites within Onkar's Protected Area. On appeal, Choice contends that, because Comfort Suites and Comfort Inn & Suites were the same brand of hotels, it had the right to replace the Comfort Inn & Suites with a Comfort Suites.[12]

Choice's position is based on the Policy, which defines a Protected Area for Onkar's Comfort Suites within which Choice generally would not grant a franchise "for the same brand as

---

[12]The party moving to vacate an arbitration award bears the "heavy burden" of showing that the award is invalid. *See Baltimore Teachers Union, Am. Fed. of Teachers, Local 340*, 671 A.2d 80, 87 (Md. App. 1996). The movant bears

14

your hotel." The Impact Policy, however, includes a specific exception allowing replacement of a previous franchise inside the Protected Area with the same brand: "Choice reserves the right to replace any franchise which has departed or which is scheduled to depart from a Choice brand system ('departed/departing franchise') with a same-brand franchise, located anywhere within the [Protected Area] of the departed/departing franchise." The Policy further provides that Choice "will not grant a replacement franchise if it is to be located within the" Protected Area of a same-brand hotel in good standing, unless the departed/departing franchise was/is already located in such same-brand hotel's" Protected Area. There is no dispute that the Comfort Inn & Suites was a departing franchise.[13]

The question before the arbitrators was whether Choice violated the Agreement by franchising a Comfort Suites within Onkar's Protected Area. Choice claims that the arbitrators' decision was correct based on the plain text of the Policy, which identified Choice brands and sub-segments thereof, in the Policy: "This Policy shall apply to all Choice hotels that are part of the Clarion, Comfort, Quality, Sleep, Econo Lodge, Rodeway, or MainStay brands (including all hotels that are part of any sub-segment of those brands, such as Comfort Suites, for example)." Choice takes the position—as did the arbitrators—that Comfort is the "brand" and Comfort Suites is a "sub-segment" of that brand—not an independent brand. Onkar interprets this language to

---

the burden of showing, by the record, that the error occurred. Mere allegations and arguments contesting the validity of an award, unsubstantiated by the record, are insufficient to meet that burden. *Kovacs v. Kovacs*, 633 A.2d 425, 432 (Md. App. 1993); *see Downey*, 51 A.3d at 583.

[13]The Policy defines "departed/departing franchise" as "any open hotel, executed franchise agreement or approved franchise application."

15

mean that the "Policy protections apply to the sub-segment categories, including Comfort Suites®. Therefore, [under Onkar's interpretation,] Comfort Suites® is its own distinct brand to which 'this Policy shall apply.'"[14]

In further support of its position that Comfort Suites and Comfort Inn & Suites are sub-segments of the Comfort brand, Choice relies on the Interpretational Notes section of the Policy. Interpretational Note 1 states that "the Sleep and Comfort hotel brand systems shall be considered the same hotel brand system for the purposes of Choice's Incremental Impact Policy." It further refers to "a Sleep brand hotel" and "a Comfort brand hotel" when defining "incremental impact."

In making its decision, the arbitration panel considered extrinsic evidence, including Choice's website, which lists Comfort Suites separately from other Comfort hotels, and the fact that Comfort Suites has a color scheme and logo different from Comfort Inn & Suites. In deciding that Choice did not breach the Agreement, however, it primarily relied on the language of the Policy quoted above and testimony on this issue.[15]

Onkar contends that this decision was not merely a misinterpretation of a contract. It contends that the panel simply ignored the plain language of the contract.[16] The substance of

---

[14]The Agreement states, "You agree to operate the Hotel solely under the Mark and trade name COMFORT SUITES® and the designated logo or any other registered trademark as we may require from time to time."

[15]This testimony is attached to Choice's motion for summary judgment. A representative for Choice testified that "Comfort" is the family and "Comfort Inn, Comfort Suites, and Sleep Inn have the same brand. So for replacement, any of those could be replacing each other." The representative testified that the "Comfort family has a 98 percent brand recognition. So for us, that to the consumer, when they're traveling, they see the name Comfort, whether it's suites, inn and suites, or Comfort Inn, they associate that with Comfort, which is why we have Comfort Suites as a subset, not as a separate brand. It's the Comfort family."

[16]Onkar relies on *United Paperworkers v. Misco*, 484 U.S. 29, 38 (1987) (an "arbitrator may not ignore the plain language of the contract").

16

Onkar's argument, however, illustrates the fact that this is simply a difference of opinion on the matter of how the Agreement is properly construed.

According to Onkar, "the death knell to Choice's position that Comfort Suites and Comfort Inn & Suites is the same brand comes from their own corporate and transactional documents." Onkar contends that *each subsegment is its own brand*, because "Comfort" is a "family of brands." In support of this claim, Onkar relies on the Comfort Suites Rules & Regulations,[17] which state, "The Welcome Wall, is a signature component of the design initiative for the Comfort Family of brands." Onkar claims that, because the Welcome Wall is designed for the "Comfort Family of brands," Choice has admitted that "Comfort" includes more than one brand and that each is separate. The Comfort Suites Rules and Regulations also repeatedly reference the "Comfort Suites brand."

The fact that each subsegment has its own rules and regulations does not mean, counters Choice, that the subsegments are different brands. It relies on the definition of "subsegment" as "a segment that is part of a larger segment." *Subsegment*, MERRIAM-WEBSTER DICTIONARY (2019 ed.)

Despite the fact that Onkar takes the position that the contract is crystal clear and unambiguous, Onkar relied on extrinsic evidence to suggest that Comfort Inn & Suites is a different brand than Comfort Suites because it "includes a very small number of suites compared to Onkar's operation [and] uses an entirely different color scheme and signage such that there would be no

---

[17]The Agreement frequently references the rules and regulations and requires compliance with the rules and regulations in various respects.

confusion between a Comfort Inn & Suites and a Comfort Suites." Onkar further distinguished the two by discussing the difference in the number of occupants, room dividers, and enhanced amenities.

Additional extrinsic evidence relied on by Onkar included Choice's internal emails asking the owner of the Arkansas Comfort Suites to consider changing brands, stating that, "[to] be impartial, the property that exited the system was a Comfort Inn and Suites therefore it's a lot easier to justify replacing it with another [Comfort Inn and Suites]." Another email by Choice stated that, "[T]his one is denied as a replacement. . . . It will need to go through regular impact."[18] Although Onkar makes a sensible argument that the arbitration panel did not properly construe the Agreement in deciding that Comfort Suites and Comfort Inn & Suites are the same brand, this purported failure cannot properly be characterized as an overstep of authority. Even if the arbitrators erred in their decision, "mere errors of law and fact do not ordinarily furnish grounds for a court to vacate . . . an arbitration award." *Downey*, 51 A.3d at 583. The question before this Court is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans LLC*, 133 S.Ct. at 2070–71. If the panel even arguably construed the contract, this Court cannot correct the panel's perceived mistakes on the ground the panel exceeded its authority. *Id*. Onkar has failed to meet the heavy burden of establishing this ground of vacatur.[19] *See Birkey Design Grp., Inc. v. Eagle Nursing Home, Inc*.,

---

[18]These pieces of extrinsic evidence were attached to Onkar's summary judgment response.

[19]As a sub-issue, Onkar also complains of the following language in the panel's decision: "Claimants objected in writing to the new franchise on July 25, 2011. However, they did not follow the procedure set forth in the Policy required to request an incremental impact study which would have measured the potential impact on Claimants' revenue of the new hotel."

687 A.2d 256, 267 (Md. App. 1997) ("If, on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced.").

        *(b)     The Arbitrators Did Not Exceed Their Powers by Failing to Apply Maryland Law*

Onkar next contends that the panel exceeded its power because it applied a "sole cause" standard of causation rather than a proximate cause standard, as required by Maryland law.[20] This claim is based on the following language in the panel's decision:

> Even assuming *arguendo*, that there had been a breach of the contract, Claimants failed to prove that their loss of revenue was due to that breach. Claimants presented the Panel with an "all or nothing" damages model, but they failed to prove that all of their hotel's losses were due solely and directly to the claimed breach of contract.

---

This statement reflects a misreading/misunderstanding of the Policy's requirements. Article II of the Policy addresses same-brand franchises within the Protected Area. It provides:

> Choice will initiate an incremental impact study . . . when it receives a franchise application for the same-brand hotel's [Protected Area] if Choice determines that the market containing your hotel is inadequately served by that Choice brand system. You must formally object to the application in order for Choice to initiate the incremental impact study." Article III addresses same-brand franchises outside the Protected Area and sets forth a procedure for the franchisee to request an independent incremental impact study.

Onkar was not required to request an incremental impact study in this case. Even so, this is an instance of dicta which was of no consequence to the decision. The panel determined that Choice did not breach the contract because it replaced the franchise with the same brand. Onkar's alleged failure would perhaps best be characterized as a defensive issue, in the event of a breach by Choice.

[20]*Hoang v. Hewitt Ave.*, 936 A.2d 915, 934 (Md. App. 2007) (plaintiff must prove defendant's breach of contract was proximate cause of claimed damages).

.

Because the panel determined that there was no breach of contract, it did not decide the damage question.  This language is merely dicta and is of no consequence.  It is not a basis on which to vacate the decision.

### *(c)      The Arbitrators Did Not Manifestly Disregard the Law*

In 2018, the Maryland Court of Appeals determined that a court may vacate an arbitrator's decision for manifest disregard of applicable law even though that ground is not listed as a statutory ground for vacatur.  *WSC/2005 LLC v. Tri Ventures Assocs.*, 190 A.3d 255, 260 (Md. 2018).  The court recognized manifest disregard of the law as a permissible common-law ground for vacating an arbitration award.  *Id*. at 256.  It further determined that the Act did not abrogate the common law in this respect.  *Id*. at 263.  Consequently, an arbitration award subject to the Act may be vacated for manifest disregard of the law.  *Id*. at 264.

In examining the contours of this "elusive standard," the court explained that a manifest disregard of the law is "beyond and different from a mere error in the law or failure on the part of the arbitrator to understand or apply the law."  *Id*. at 265 (quoting *Baltimore Cty. Fraternal Order of Police Lodge No. 4 v. Balt*. *Cty.*, 57 A.3d 425, 425 (Md. 2012)).  Instead, manifest disregard of the law "connotes a palpable mistake of law or fact . . . apparent on the face of the award . . . ." *Id*. (quoting *Baltimore Teachers Union, Am. Fed. of Teachers, Local 340 v. Mayor & City Council of Balt*., 108 Md. App. 167, 181, 671 A.2d 80 (1996)).[21]  The court also recognized federal cases that have applied the rule when (1) the applicable legal rule is clearly defined and (2) the arbitrator

---

[21]Dictionaries define "manifest" as clear, obvious or unquestionable, and "palpable" as easily perceived or obvious. *WSC/2005 LLC*, 190 A.3d at 265–66.

refused to apply that rule. *Id*. at 265 (citing *Sanchez v. Elizondo*, 878 F.3d 1216, 1223 (9th Cir. 2018); *Wachovia Secs., LLC v. Brand*, 671 F.3d 472, 480–81 (4th Cir. 2012); *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 451–52 (2d Cir. 2011); *Hollern v. Wachovia Secs., Inc.*, 458 F.3d 1169, 1176 (10th Cir. 2006); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).

Stated differently, a party invoking "manifest disregard of the law" must show the award was "'based on reasoning so palpably faulty that no judge, or groups of judges, could ever conceivably make such a ruling . . . .'" *Id*. at 266 (quoting 4 Thomas H. Oehmke & Joan M. Bovins, *Oehmke Commercial Arbitration* § 149-2, 149-4 (3d ed. 2017)). The court concluded that, in reviewing an award, "[w]e look for an error that is readily perceived or obvious; an error that is clear or unquestionable." *Id*.

For the reasons previously discussed, the arbitration panel did not arrive at a decision that "no judge, or groups of judges, could ever conceivably make." Because there is no unquestionable error in this circumstance, this common-law ground for vacatur does not apply. And, because Onkar failed to prove any basis on which the arbitration award could be vacated, the trial court was bound to confirm the award—assuming, though, that the arbitration clause was enforceable.

### (2)    *The Arbitration Contract Was Enforceable*

The Act provides,

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except on grounds that exist at law or in equity for the revocation of a contract.

21

MD. CODE ANN. CTS. & JUD. PROC. § 3-206. Whether a valid arbitration agreement exists "depends on contract principles since arbitration is a matter of contract." *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003). Consequently, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).[22]

Under Maryland law, courts are not permitted, when assessing the enforceability of an arbitration agreement, "to go beyond the confines of the arbitration agreement itself and into an analysis of the validity of the larger contract." *Cheek*, 835 A.2d at 664. If an arbitration contract is invalid, the award must be vacated pursuant to Section 3-224(b)(5), which provides that "the court shall vacate an award if . . . there was no arbitration agreement as described in § 3-206 of this subtitle. . . ." MD. CODE ANN. CTS. & JUD. PROC. § 3-224(b)(5).

Choice claims that the trial court erred in failing to confirm the arbitration award in the absence of contract defenses that would void the arbitration clause. Onkar, however, claims that the arbitration agreement was invalid because (a) there was no consideration for the arbitration provision, (b) the procedure for exercising arbitration failed to create an impartial and neutral forum, and (c) Onkar was fraudulently induced to agree to the arbitration clause.

---

[22]This explanation was stated within the context of Section 2 of the FAA, which provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save and upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2.

*(a) Consideration for the Arbitration Agreement*

Binding and enforceable contracts require consideration. *Cheek*, 835 A.2d at 661. Consideration is established by showing "a benefit to the promisor or a detriment to the promisee." *Harford Cty. v. Town of Bel Air*, 704 A.2d 421, 430 (Md. 1995). The arbitration agreement itself must, within its four corners, contain adequate consideration. *Cheek*, 835 A.2d at 667. When contracting parties exchange reciprocal promises to arbitrate disputes, each promise provides consideration for the other. *Id*. at 664. However, when a promise appears to be a promise, but it does not actually bind the promisor to anything, it is illusory. *Id*. at 662. It is this type of promise Onkar claims Choice provided as consideration for the arbitration agreement.

Onkar claims that the arbitration provision is illusory because "Choice enjoys an unfettered ability to breach its contracts with impunity due in no small part to the forum selection of the arbitration proceedings. Choice's uncompromised defeat of the mutuality of arbitration creates a lack of consideration therefor, which defeats the arbitration provision."

The arbitration clause in this case requires that "any controversy or claim arising out of or relating to this Agreement . . . will be sent to final and binding arbitration before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules of the American Arbitration Association. . . ." Excepted from the arbitration provision are Choice's "claims against you for indemnification or actions seeking to enjoin you from using the Marks in violation of this Agreement." The failure of consideration cases involving illusory promises focus on the fact that only one party was bound by the arbitration provision. *See Cheek*, 835 A.2d at 662.

23

In the *Cheek* case, Cheek argued that his arbitration agreement with his employer, United HealthCare, was unenforceable because it was unsupported by consideration. Cheek argued that the following language in the agreement rendered United HealthCare's promise to arbitrate illusory: "United HealthCare reserves the right to alter, amend, modify, or revoke the Policy at its sole and absolute discretion at any time with or without notice." *Id.* The court, in agreeing with Cheek, explained,

> United initiated the arbitration with Cheek; it has not revoked nor in any way altered the Arbitration Policy with Cheek at any time. Nonetheless, the fact that "United HealthCare reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice" creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate. Indeed, the plain and unambiguous language of the clause appears to allow United to revoke the Employment Arbitration Policy even after arbitration is invoked, and even after a decision is rendered, because United can "revoke" the Policy "at any time." Thus, we conclude that United's "promise" to arbitrate employment disputes is entirely illusory, and therefore, no real promise at all.

*Id.*

Even arbitration agreements which except specific claims from arbitration have been held to be enforceable. For example, in *Walther v. Sovereign Bank*, 872 A.2d 735 (Md. 2005), the arbitration agreement provided the lender with an option to foreclose or arbitrate, which option was not provided to the borrower.

> We do not find that the exceptions to the arbitration agreement, which allow Sovereign Bank to litigate certain specific claims instead of having to submit them to arbitration, are so unfairly oppressive as to make the agreement unconscionable. Unlike *Cheek*, the arbitration clause at issue here is not illusory—Sovereign Bank is bound to arbitrate certain disputes, just as are petitioners, instead of pursuing them in a judicial forum. The mere fact that the arbitration agreement does except from its purview, however, a foreclosure proceeding, does not destroy mutuality and make the arbitration agreement so one-sided as to make it unconscionable.

24

*Id*. at 748.  Here, because Choice was bound to arbitrate under the agreement, its promise to arbitrate was not illusory.

### (b)    No Lack of Impartial Forum

Onkar claims the arbitration agreement is unenforceable because it undermines its access to a neutral forum to vindicate its rights.  Indeed, arbitration provisions may be unenforceable when they are substantively or procedurally unconscionable.  Substantive unconscionability has been discussed in several cases under Maryland law.

For example, "where an arbitration agreement contains provisions that deny one party access to a neutral, arbitral forum, those provisions may make the agreement unenforceable." *Raglani v. Ripken Prof'l Baseball*, 939 F.Supp.2d 517, 523 (D. Md. 2013).  In that case, the court held that an arbitration agreement that allowed the employer to choose the arbitrator and insufficiently defined the rules by which arbitration would be conducted denied the employee a neutral arbitral forum.  *Id*. at 524–25.  The agreement gave Ripken exclusive control over the list of arbitrators that may be used.  *Id*. at 524.  The court rejected Ripken's argument that the agreement provided for a neutral forum because the agreement stated that it "involves an impartial external third party."  The court held that "simply promising to provide a list of impartial arbitrators, without providing a mechanism by which the selection of an impartial arbitrator will actually be ensured, is insufficient."  *Id*.  Ripken's provision of a list from which Raglani could choose was insufficient because the "employee's choice is entirely circumscribed by the list [Ripken] provides."  *Id*.  The Court stated:

It has now long been established in this circuit that an employer may not "provid[e] itself with the exclusive right to select the list of potential arbitrators from which the ultimate decisionmaker will be selected." *Murray*, 289 F.3d at 303 (citing *Hooters*, 173 F.3d at 939). As the Fourth Circuit explained in both *Hooters* and *Murray*, an arbitration agreement is invalid where:

> [The employer] is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with [the employer] and its management. . . . Further, nothing in the rules restricts [the employer] from punishing arbitrators who rule against the company by removing them from the list. Given the unrestricted control that [the employer] has over the panel, the selection of an impartial decision maker would be a surprising result.

*Id*. (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir.1999)).[23]

Consequently, when the arbitration contract fails to include a mechanism for selecting a neutral arbitrator, the agreement may be unconscionable. *See Caire v. Conifer Value Based Care, LLC*, 982 F.Supp. 582, 595 (D. Md. 2013). In *Caire*, the arbitration agreement afforded the employer the sole discretion to alter the arbitration agreement's terms, the arbitration policy did not contain a mechanism for selecting a neutral arbitrator, and the employer made clear that it would arbitrate only on terms it deemed favorable in rejecting the plaintiff's attempt to arbitrate before the AAA. *Id*. On these facts, the arbitration agreement was unconscionable.

Onkar relies on *Raglani* in support of its argument that it was deprived of a neutral forum because (1) the agreement mandated that arbitrations occur at Choice's headquarters in Rockville, Maryland, (2) Choice narrowed the list of available arbitrators to those who have arbitrated Choice cases favorably in the past, (3) Choice created a financial incentive for the arbitrators to rule in its

---

[23]*Raglani* involved arbitration of a statutory cause of action, i.e., a Title VII claim.

favor by the likelihood of repeat business, and (4) Choice punished arbitrators who ruled against it.

Onkar's brief fails to explain why the forum selection clause of the arbitration agreement fails to provide a neutral forum. It simply classifies this clause an "adhesion clause" and then states, without record or legal support, that, "[w]ith a limited number of arbitrators available in such a small geographical area, supporting a single business entity of such immensity, the chances of drawing the same arbitrators numerous times is very high."

"The parties' agreement as to the place of the action will be given effect unless it is unfair or unreasonable." *Secure Fin. Serv., Inc. v. Popular Leasing USA, Inc.*, 892 A.2d 571, 576 (Md. 2006). A party challenging a forum selection clause bears the burden of proving that enforcing the clause is unfair or unreasonable by showing that the clause was "obtained by fraud, duress, the abuse of economic power, or other unconscionable means," or that the selected forum "would be closed to the suit or would not handle it effectively or fairly." *Id*. at 577. Onkar has not met this burden.

Onkar next claims that Choice narrowed the list of available arbitrators to those who have arbitrated Choice cases favorably in the past. In support of this claim, it relies on an exhibit presented in the trial court titled "AAA Selection of Arbitrators in the Order Presented to Litigants." Onkar's post-arbitration research revealed that fifteen of those twenty-three suggested arbitrators had conducted Choice arbitrations in the past, and each had issued one or more awards in Choice's favor. Although Onkar admits that the AAA arbitrators had disclosed they had

27

conducted Choice arbitrations in the past, they evidently did not tell Onkar how many of those past

decisions were favorable to Choice. Onkar's post-arbitration research also allegedly revealed that,

> of the 200 or so arbitrations that Plaintiffs' counsel was able to find on Pacer in Maryland alone, Choice lost only 1. That 1 arbitration occurred in 2008 in the case styled Choice Hotels International, Inc. v. Singh, Deol, and Kaur . . . , arbitrated by Attorney, Laurence Schor. However, those same records indicate that arbitrator Schor was never again selected by Choice.

This argument assumes that Choice provided the list of arbitrators. Nothing in the record

suggests this was the case. In fact, the arbitration agreement indicated that the list of arbitrators

was provided by the AAA, and not by Choice. The arbitration agreement specifically required the

parties to conduct the arbitration in accordance with the AAA Commercial Arbitration Rules.

AAA Commercial Arbitration Rule R-12 provides a neutral framework for the selection of

arbitrators.[24] There was no evidence before the trial court or in the record before this Court that

---

[24]Rule R-12 of the AAA Commercial Arbitration Rules provides:

> If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrators shall be appointed in the following manner:
>
> (a) The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.
>
> (b) If the parties are unable to agree upon the arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among members of the National Roster without the submission of additional lists.
>
> (c) Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

Rule R-12 was not followed in this case.  Onkar's trial court filings indicate that the AAA selected the list of twenty-three arbitrators submitted to the parties.  *Raglani* does not apply in this scenario.

Finally, Onkar claims that Choice created a financial incentive for the arbitrators to rule in its favor by the likelihood of repeat business and by punishing arbitrators who ruled against it.  In support of this claim, Onkar states that,

> [i]n a telephone conversation with Mr. Schor in or about September 2017, Mr. Slim learned that he had just been selected to arbitrate for Choice again in 2017, some 9 years after he was blacklisted, and just about the time that Plaintiffs began their investigation in to [sic]  Choice's arbitration fraud.

There is little to no record support for this argument.[25]

Onkar had the opportunity to conduct its due diligence before the arbitration and to raise the concerns it now raises, but evidently failed to do so.  On this record, Onkar has failed to

---

[25]Jules P. Slim, the attorney for Onkar, testified at the injunction hearing regarding his PACER research.  Choice objected to this evidence because it only reflected certain filings.  According to Choice, it omitted state court filings or petitions to enforce or vacate.  It likewise does not reflect the full record of Choice's arbitration history as it omitted any cases that were settled.  Slim testified that he represented Onkar in the arbitration.  He testified that the contract was breached and about why he thought the arbitrators got it wrong.  He also testified that he looked for every Choice case on PACER that he could find.  He stated, "I found 200 arbitrations, every single one of which Choice had won, with the exception of one, and a fellow named Shore, ruled against Choice.  And that guy's name never showed up again in another arbitration until I called them out on it, and guess who just got a Choice arbitration."  Slim testified that the AAA gave him a list of twenty-three names to choose from.  He further testified that,

> the way this system is set up, every arbitrator has to go to their corporate headquarters, so they get this small pool of lawyers out in Montgomery County, Maryland, and maybe a couple of surrounding areas, where they draw from.  Well, this is a $4 billion company.  They get these things all the time.  When you geographically restrict arbitrations to one tiny little cosmos, you get all this repeat business, and these arbitrators now become financially incentivized to rule for Choice.  By way of example, Mr. Shore, the only one that had the guts, that I could find, to rule against them, you never see his name again.

He further testified that he probably received the list of arbitrators from the AAA in alphabetical order.  He testified that the AAA is probably conspiring with Choice to rig arbitrations in Montgomery County, Maryland.  Counsel for Choice testified that the list of 200 arbitrations were collection cases in which the debtor rarely showed up.

establish arbitrator bias or the lack of an impartial arbitration panel. *See Birkey*, 687 A.2d at 270; *Graceman v. Goldstein*, 613 A.2d 1049, 1056 (Md. App. 1992).

### (c) No Fraudulent Inducement

Contracts obtained by fraud are voidable at the election of the parties affected by the fraud. *Julian v. Buonassissi*, 997 A.2d 104, 119 (Md. 2010). "[F]raudulent inducement means that a party has been led to enter into an agreement to his or her disadvantage as a result of deceit." *Sass v. Andrew*, 832 A.2d 247 (Md. 2003). "This must include a willful non-disclosure or false representation of a material fact." *Christian v. Maternal-Fetal Med. Assocs. of Md., LLC*, 183 A.3d 762, 769 (Md. 2018). A "material fact" is one on which a reasonable person would rely in making a decision. *Sass*, 832 A.2d at 260. However, "Maryland recognizes no general duty on a party to a transaction to disclose facts to the other party." *Maryland Envtl. Tr. v. Gaynor*, 803 A.2d 512, 516 (Md. 2002). Therefore, concealment of a material fact constitutes fraud only if there is a duty of disclosure. *Sass*, 832 A.2d at 260. A duty of disclosure arises out of a fiduciary or confidential relationship. *Homa v. Friendly Mobile Manor, Inc.*, 612 A.2d 322, 326–27 (Md. App. 1992); *Finch v. Hughes Aircraft Co.*, 469 A.2d 867, 890–91 (Md. App. 1984).

In support of its claim that it was fraudulently induced into signing the arbitration agreement, Onkar relies on the Declaration of Maljinder Singh, the president of Onkar Lodging, Inc. Singh stated in his declaration, "I was fraudulently induced into agreeing with the arbitration provision." Singh claims that he did not understand what arbitration was and did not know the rules of procedure before the AAA. He was "never told that there would only be a small pool of

arbitrators at the disposal of Choice Hotels or how much money they would make with repeat business if they ruled in Choice Hotel's favor." Likewise, Singh was

> never told that having the arbitrations at Choice's headquarters would create an environment where that same small pool of arbitrators would repeatedly be deciding Choice Hotels lawsuits and that such a small pool of arbitrators would have a financial incentive to rule in Choice's favor, and that if an arbitrator did not rule in their favor, that arbitrator might not be allowed to conduct a Choice arbitration again just because Choice objected to that arbitrator.

Singh claims that, if these things had been disclosed to him, he would never have agreed to an arbitration provision in the Agreement and would not have opened a Choice branded hotel.

Singh does not claim that Choice made any sort of material misrepresentation to him relative to the arbitration agreement. He merely claims that he was never told certain things that would have impacted his decision to enter into the Agreement. Even assuming the substance of the "non-disclosed" information was correct, there is no claim in this case that Choice was under any duty to disclose this information to Singh. The parties to the arbitration agreement conducted an arms-length transaction which did not give rise to a confidential or fiduciary relationship.[26] Onkar was not fraudulently induced to enter into the arbitration agreement.

The arbitration clause is valid and enforceable.[27]

---

[26]The Agreement specifically states, "This Agreement does not create a fiduciary relationship between you or us."

[27]Because we find that the trial court should have confirmed the arbitration award, we need not address the question of whether the trial court erred in ordering a new arbitration in Dallas.

31

We reverse the judgment denying confirmation of the arbitration award and ordering a new arbitration and render judgment confirming the award.


Josh R. Morriss, III
Chief Justice

Date Submitted:     May 8, 2019
Date Decided:      June 5, 2019